In the District Court of the United States
For the District of South Carolina
BEAUFORT DIVISION

| | | |
|---|---|---|
| Aaron Wayne Pellum, #288440, | ) | Civil Action No. 9:05-3339-JFA-GCK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF THE MAGISTRATE JUDGE** |
| Stan Burtt, Warden of Lieber Correctional | ) | |
| Institution; NFN Bodison, Associate | ) | |
| Warden; NFN Thompson, Associate | ) | |
| Warden; NFN Nettles, Major; NFN Elka, | ) | |
| Lieutenant; G. Antley, Investigator at | ) | |
| Lieber Correctional Institution; NFN | ) | |
| Nunley, Captain; NFN Smith, Doctor, | ) | |
| all sued in their individual and official | ) | |
| capacity; and L. Carrington, Institutional | ) | |
| Grievance Coordinator at Lieber | ) | |
| Correctional Institution, sued in her | ) | |
| individual capacity and official capacity; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I. INTRODUCTION



The Plaintiff, Aaron Wayne Pellum ("Plaintiff" or "Pellum"), is a state prisoner who was

incarcerated in the South Carolina Department of Correction's Lieber Correctional Institution

("Lieber" or "Lieber CI") at the time of the events giving rise to this action. He has filed this

action against the above-named Defendants, Stan Burtt, Warden of Lieber Correctional

Institution ("Warden Burtt"); NFN Bodison, Associate Warden ("AW Bodison"); NFN

Thompson, Associate Warden ("AW Thompson"); NFN Nettles, Major ("Major Nettles"); NFN

Elka, Lieutenant ("Lt. Elka"); G. Antley, Investigator at Lieber Correctional Institution

("Investigator Antley"); NFN Nunley,[1] Captain ("Captain Nunnally"); NFN Smith, Doctor ("Dr.

---

[1]    The correct spelling of this defendant's name is Nunnally, which will be used throughout this
Report and Recommendation. *See* Affidavit of Duard S. Nunnally, Jr. (hereinafter "Nunnally
Affidavit"). [134-7]

Smith"), and L. Carrington, Institutional Grievance Coordinator at Lieber Correctional Institution

("IGC Carrington"). The Plaintiff has sued Warden Burtt, AW Bodison, AW Thompson, Major

Nettles, Lt. Elka, Investigator Antley, Captain Nunnally, Dr. Smith, and IGC Carrington

(collectively, the "Defendants") individually and in their official capacities. Plaintiff seeks relief

pursuant to Title 42, United States Code, Section 1983 for alleged violations of the rights

guaranteed under the First, Eighth, and Fourteenth Amendments to the United States

constitution, as well as Article 1 of the South Carolina State constitution, and requests a trial by

jury.

This case was automatically referred to the undersigned United States Magistrate Judge

for all pretrial proceedings pursuant to the provisions of Title 28, United States Code, Sections

636(b)(1)(A) and (B), and Local Civil Rules 73.02(B)(2)(c) and (e), D.S.C. The Plaintiff and the

Defendants have filed motions for summary judgment. [133; 134] As these are dispositive

motions, this Report and Recommendation is entered for review by the District Court.

## II. *PRO SE* COMPLAINT

Plaintiff is a *pro se* litigant, and thus his pleadings are accorded liberal construction.



*Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*); *Estelle v. Gamble*, 429 U.S. 97 (1976);

*Haines v. Kerner*, 404 U.S. 519 (1972); *Loe v. Armistead*, 582 F. 2d 1291 (4th Cir. 1978); *Gordon*

*v. Leeke*, 574 F.2d 1147, 1151 (4th Cir.), *cert. denied, Leeke v. Gordon*, 439 U.S. 970 (1978).

Under established local procedure in this judicial district, a careful review has been made of the

*pro se* Petition herein pursuant to the procedural provisions of the Anti-Terrorism and Effective

Death Penalty Act of 1996, Pub. L. No. 104-132, Title I, § 104, 110 Stat. 1214. This review has

been conducted in light of the following precedents: *Denton v. Hernandez*, 504 U.S. 25 (1992);

*Neitzke v. Williams*, 490 U.S. 319, 324-25 (1989); *Haines v. Kerner*, 404 U.S. 519 (1972); *Nasim*

Page 2 of 71

v. *Warden, Maryland House of Correction*, 64 F.3d 951 (4th Cir. 1995) (*en banc*), *cert. denied*, 516 U.S. 1177 (1996); *Todd v. Baskerville*, 712 F.2d 70 (4th Cir. 1983).

*Pro se* pleadings are held to a less stringent standard than those drafted by attorneys. *Hughes*, 449 U.S. 5 (1980). Even under this less stringent standard, however, the *pro se* complaint nonetheless may be subject to summary dismissal. The mandated liberal construction afforded to *pro se* pleadings means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so, but a district court may not rewrite a petition to include claims that were never presented. *Barnett v. Hargett*, 174 F.3d 1128 (10th Cir. 1999). Likewise, a court may not construct the plaintiff's legal arguments for him (*Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993)) or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), *cert. denied*, 475 U.S. 1088 (1986). The requirement of liberal construction, however, does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal district court. *Rice v. National Security Council*, 244 F.Supp. 2d 594 (D.S.C. 2001), *citing Weller v. Department of Social Services*, 901 F.2d 387 (4th Cir.1990).

### III. BACKGROUND TO THE CASE



Plaintiff alleges in his twenty-four (24) page verified Complaint[2] that on or about December 15, 2004, he asked Sgt. Hamilton at Lieber for protective custody because two fellow-inmates, Jimmy Johnson and Tony Lee, had threatened his life and threatened to rob him unless

---

[2]    In this Circuit, verified complaints by *pro se* prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). Plaintiff has filed a verified Complaint. Therefore, the undersigned has considered the factual allegations set forth in the verified Complaint in issuing this Report and Recommendation.

he gave them $100.00 worth of items from the Lieber canteen. (Compl. at 8).[3] Sgt. Hamilton

sent Plaintiff to the Operations building to see the supervisor. (Compl. at 8). Lt. Elka put the

Plaintiff in an Operations holding cell for two days, pursuant to the "policy" of Warden Burtt,

AW Bodison, AW Thompson, Major Nettles, Lt. Elka, and Captain Nunnally to keep inmates

who request protective custody in a holding cell for days to "break inmates down" so they would

be willing to return to general population. (Compl. at 7-8)  Plaintiff contends that the holding

cell is designed only to keep inmates in temporarily, because it does not have a toilet, running

water, heat, or ventilation; the cell has a concrete floor and walls and is completely bare except

for a small wooden bench approximately eight inches wide. (Compl. at 8).  Plaintiff states that in

December 2005, the holding cell was very cold, and the lights stayed on all day and night so

"there is no sleep." *Id.*  Lt. Elka refused Plaintiff's request for a blanket; for two days, Plaintiff

was deprived of all basic human needs, including a shower or a change of clothes. *Id.*  Plaintiff's

repeated requests to be placed in protective custody were refused and Plaintiff was told to go

back to his dorm. *Id.*  Plaintiff believes that the Defendants did not want to complete the

paperwork required for protective custody. (Compl. at 8-9).  Plaintiff alleges that Warden Burtt,

AW Bodison, AW Thompson, Major Nettles, and Lt. Elka acted individually, or conspired with

each other, to deprive him of basic human needs. (Compl. at 10).

  After two days, Plaintiff's body was sore and he was in pain from lying on the concrete

floor and hard wood benches and he had gotten no sleep. (Compl. at 10).  Plaintiff "broke" and

went back to the general population at Lieber; he was returned to the same dorm and the same

wing as Jimmy Johnson and Tony Lee, the inmates who had threatened him. (Compl. at 10).  On

---

[3]     The pages of the Complaint were not numbered, but the court has numbered them for ease
of reference and will refer to the numbered pages throughout this Report.

December 25, 2004, Jimmy Johnson and Tony Lee robbed Plaintiff of his wristwatch and wedding band. *Id.*

Plaintiff alleges that the Defendants' denial of protective custody was "a direct go ahead to those two inmates to rob me" because it appeared that prison officials would not protect him even after he told them that Johnson and Lee were planning to rob him. (Compl. at 10). Plaintiff contends that Warden Burtt, AW Bodison, AW Thompson, Major Nettles, and Lt. Elka acted individually, or conspired with each other, to deny him protection from Johnson and Lee, whom they knew wanted to rob Plaintiff. (Compl. at 10).

Plaintiff told Sgt. Hamilton that he had just been robbed and stated that Johnson and Lee would kill him if he reported the robbery. (Compl. at 11). Sgt. Hamilton sent Plaintiff to the Operations Building to see Lt. Elka. *Id.* Plaintiff told Lt. Elka that he had been robbed by Johnson and Lee and again asked to be placed in protective custody; Lt. Elka refused to put Plaintiff in protective custody and again placed Plaintiff in the Operations holding cell. *Id.* Plaintiff was given an 8 ounce Styrofoam cup to use as a toilet during the night. Plaintiff was "cold and shaking" in the holding cell. Plaintiff was locked in the Operations holding cell for five days (December 25-30, 2004). (Compl. at 12). Plaintiff did not have a mattress, blanket, running water, or toilet and used cups and food trays as a restroom. (*Id.*). The lights stayed on all day and night, and Plaintiff did not sleep during that five day time. (Compl. at 10). Lt. Elka refused to give him a mattress or a blanket, or hygiene items, and "denied [him] all basic human needs". (Compl. at 11).



During the five days that Plaintiff was locked in the holding cell, Plaintiff spoke personally with Warden Burtt, AW Bodison, AW Thompson, and Major Nettles and told each of these Defendants that he had been robbed and his life had been threatened. Plaintiff asked each of those Defendants to release him from the holding cell and place him in protective custody.

Page 5 of 71

(Compl. at 12). *Id.* Plaintiff contends that Warden Burtt, AW Thompson, AW Bodison and Major Nettles each had the authority to put inmates in protective custody, but between December 25 and December 30, 2004, the Defendants denied him protective custody status, and kept him in the holding cell, without running water, a toilet, a shower, hygiene items, a mattress, a change of clothing, or a blanket, and Plaintiff had to use cups and food trays as a restroom. Furthermore, the Defendants could see that Plaintiff was without such basic necessities and that the Defendants were deliberately indifferent to his safety and well-being. *Id.*

On December 29, 2004, inmate Brian Evans ("Evans") was placed in the holding cell with Plaintiff, and Evans and Plaintiff were provided with mattresses. The next morning, Plaintiff was awakened by Evans' yelling. (Compl. at 12). Plaintiff looked over his shoulder and saw Captain Nunnally standing on Evans' hand. Plaintiff pushed himself up to his knees and Captain Nunnally stepped over Evans and kicked Plaintiff in his back, which caused Plaintiff immediate and intense pain. (Compl. at 13). Captain Nunnally yelled at Plaintiff and Evans to put the mattresses in the hallway, and ordered them into an adjoining holding cell. Plaintiff asked Captain Nunnally to get the nurse or doctor because he felt like something was "broken" internally where he had been kicked. *Id.* Captain Nunnally ignored him and walked away. *Id.*



On December 30, Plaintiff told Major Nettles that Captain Nunnally had assaulted him and that he was scared. Plaintiff asked Major Nettles to take him to medical, or contact medical, because he was in extreme pain and felt like something was broken. (Compl. at 13). Major Nettles refused to summon medical attention for Plaintiff and ordered Plaintiff and Evans to be taken to Max Unit lockup. *Id.* Upon their arrival, Plaintiff and Evans were placed in the same cell and slept that night on steel beds without mattresses. (Compl. at p. 14).

On December 31, 2004, Plaintiff gave the morning nurse a request for medical attention, and showed the nurse the visible injury on his back. (Compl. at p. 14). The nurse told him she

would put him down to see Dr. Smith. *Id.* Plaintiff also saw the Special Management Unit

("SMU") nurse that day, who observed the Plaintiff in pain, and observed a raised welt

approximately three to four inches long and one and one-half inches wide on his back. *Id.* She

said she would put him down to see a medical doctor, and later that day brought Plaintiff several

muscle relaxers to ease Plaintiff's pain until he could see Dr. Smith on January 5, 2005. *Id.* The

SMU nurse told Plaintiff she would personally ask Dr. Smith to see him because he might have

internal injuries, and she was documenting his injuries. *Id.* Later that day, Plaintiff received a

mattress but could not climb onto his assigned top bunk due to his injuries, so he slept on the

floor. *Id.*

Later that day (December 31, 2004) Plaintiff filed a grievance against Captain Nunnally

(Grievance LCI-1214-04 or the "Grievance") complaining of the unprovoked assault. (Compl. at

16). In that Grievance, Plaintiff stated as follows:

> **Grievance:** I was put in the holding cell in operations on 12-25-04 at approx. 10:30 p.m.
> I was requesting protective custody because two inmates robbed me [and] threatened my
> life. I was made to stay in the holding cell for 5 days [and] 5 nights until 12-30-04 [at]
> approximately 3:30 p.m. There was no ventilation, no running water, no bathroom, I was
> given no clean clothes & no way to wash my body. I had to use the bathroom in cups &
> my food trays. I was given no mattress to sleep on & had to sleep on the hard cold
> concrete floor until the last night at approximately 11:30 p.m. on 12-29-04. [At]
> approximately 6 a.m.-9 a.m. on the morning of 12-30-04 Captain Nunnally entered the
> holding cell where myself & inmate Brian Evans were. He yelled "Get your sorry asses up
> & get those mattresses in the hall. This ain't no dormitory." He then stepped on Brian's
> hand, stepped over him & kicked me in the back while saying "now go tell that & see how
> bad it gets." He called me a piece of shit later that day & allowed inmates off the yard in
> [the] cell with me.
>
> **Action Requested:** [I] want to press criminal charges(assault charges) against Capt.
> Nunnally. Want a separation between me & Capt. Nunnally for fear of retaliation from him
> & his officers on the yard & Max/SMU. I want pictures of my back before the bruising
> goes away.
>
> **Specify How and When Informal Resolution Was Attempted by Grievant:** I wrote
> Warden Stan Burtt a Request Form. I wrote the investigator at Lieber a Request Form. I
> saw Nurse Alexis Ferrington in Max on 12-31-04 after I put in a request for sick call. She
> saw my back. I talked to Captain/Major Nettles. He said he hated me a white boy that's a

coward. Talk to Lt. Smith & Lt. Elka. They both said I was lying & I could go back to the yard. [I] also talked to Officer Bellamy [in] Max & she saw my back. I sent letter/request to Monica Counts & Robert Ward.

On January 1, 2005, Plaintiff submitted a Request to Staff Member (addressed to Lieber CI's doctor), which stated:

I was assaulted on Dec. 30, 2004. I was kicked in the back. My lower back is black & blue & sore. I have pains shooting up my back from the kick. It burns when I urinate and the flow is broken without my control. I don't know what's wrong with me but I need to be seen very soon. Thank you.[4]

On January 2, 2005, a nurse responded to the Request to Staff Member by writing:

As you know, you were seen on Friday in response to your verbal request. Your note is forwarded to the Max Nurse and Dr. Smith.[5]

Plaintiff contends he was "seen" by the nurse when the nurse looked at him through the food flap in his SMU cell.[6]

A few days later, the SMU nurse again looked at his back and said, "I knew it[–]it's starting to look like a kick mark" and said she would tell Dr. Smith that Plaintiff needed his attention. (Compl. at 14). On January 4, 2005, Plaintiff saw "Nurse Terry," a male nurse, at sick call. Nurse Terry looked at Plaintiff's back and promised him he would see the doctor the next day. The injury was causing pain in Plaintiff's back, leg, and right testicle and Nurse Terry said he might need outside medical care. Nurse Terry said that a doctor would have to order anything that needed to be done. (Compl. at 15).



On January 5, 2005, Plaintiff saw AW Thompson, who asked about the five days and nights in the holding cell, and said that Plaintiff's mother had been very upset and called Warden Burtt. (Compl. at 14). Plaintiff told AW Thompson of Captain Nunnally's assault, and told him

---

[4]     *See* Exhibit V V V, attached to Plaintiff's first motion for summary judgment. [104]

[5]     *Id.*

[6]     *Id.*

he needed medical care, but AW Thompson did nothing. *Id.* Plaintiff did not see Dr. Smith on January 5, 2005. (Compl. at 15). Officer Fuller tried to get Head Nurse Sanders to see him, but she refused to speak with Plaintiff. *Id.* She told Officer Fuller that Dr. Smith would have to see him before anything could be done. *Id.*

On January 6, 2005, Investigator Antley interviewed Plaintiff; Plaintiff told him Captain Nunnally had assaulted him, and showed Investigator Antley the mark on his back. (Compl. at 17). Investigator Antley refused to take a written statement from him, and refused to photograph the bruise, which at about that time had been described by the SMU nurse as "very very purple and big and clear."[7] (Compl. at 17-18). Plaintiff asked to file assault charges against Captain Nunnally, but Investigator Antley said the incident would remain at Lieber and he was done with it.[8] (Compl. at 18). Through these actions, Plaintiff contends that Investigator Antley, with the knowledge of Warden Burtt, AW Thompson, AW Bodison, and Major Nettles, conspired to cover up Captain Nunnally's assault. (Compl. at 7).

On January 6, 2005, Plaintiff wrote a Request to Staff Member (addressed to Nurse Allen or Dr. Smith) which stated:

> I have a big black & blue bruise over my left kidney. Blood is in my urine. I'm in so much pain. My back is in knots. I can't stand up straight it hurts so bad & I can't sit down for long. My left leg wants to pull up when I stand. Please see me soon. Please I'm in bad pain. Thank you.[9]

---

[7]     Plaintiff contends that photographs were taken as part of other investigations. For example, in November or December 2004, photographs were taken of five or so onions that an inmate attempted to take out of the kitchen. (Compl. at 18).

[8]     Upon returning to his cell, Plaintiff filed a grievance against Investigator Antley for waiting a week to interview him and refusing to take photographs of the injury. As more fully discussed below, the administrative process was not exhausted with respect to this grievance.

[9]     *See* Exhibit UUU, attached to Plaintiff's First motion for summary judgment. [104]

According to the notation on the Request to Staff Member, Plaintiff was scheduled to see the doctor on January 11, 2005.[10]

A few days later, the SMU nurse told Plaintiff he would be seen by Dr. Smith on January 10. However, Plaintiff did not see Dr. Smith on that date, and although he was in constant, severe pain, he did not receive any pain medication. (Compl. at 15).

On January 11, 2005, IGC Carrington replied to Plaintiff's Grievance by stating:

> **Action taken by IGC:**
> Inmate Pellum: I conferred with Warden Burtt and Investigator Antley. Your allegations are being investigated; therefore this grievance will be held until further notice.
>
> [signed] L. Carrington

Plaintiff contends that by putting the Grievance on hold, IGC Carrington in effect gave Plaintiff's injury time to heal before the Grievance was investigated by the Inmate Grievance Branch Chief and Internal Affairs. (Compl. at 16-17). Plaintiff specifically alleges that after IGC Carrington spoke to Warden Burtt and Investigator Antley, a decision was made to hold the Grievance and thus silence Plaintiff. (Compl. at 17).

On January 12, Plaintiff was seen by Dr. Smith, who ordered a urine test and prescribed pain medicine for Plaintiff. (Compl. at 15). Dr. Smith told Plaintiff he could have possible damage to his sciatic nerve. *Id.* The urine test detected blood in his urine. *Id.* Plaintiff did not receive his prescribed pain medicine until January 22, 2005. *Id.* Dr. Smith did not perform a follow-up examination, despite the blood in Plaintiff's urine and the debilitating pain in his left leg. *Id.* Plaintiff specifically alleges he had a serious medical need and was in constant pain after the assault by Captain Nunnally, and made numerous requests to see a doctor, yet had to wait thirteen (13) days to see Dr. Smith, and had to wait twenty-two (22) days for pain medication. (Compl. at 16). Plaintiff specifically alleges that because of Dr. Smith's deliberate indifference



---

[10]    *Id.*

to his serious medical needs, Plaintiff suffered extreme, prolonged pain of which Dr. Smith had been made aware, through Plaintiff's requests to medical and the requests of nurses. *Id.*

Plaintiff remained in SMU, sleeping on a mattress on the floor, until February 14, 2005, when he was transferred to McCormick Correctional Institution.[11]

## IV.  PROCEDURAL HISTORY IN FEDERAL COURT

Plaintiff filed this action on November 21, 2005,[12] alleging that the Defendants failed to protect him after he had been threatened by two other inmates, refused his request for protective custody and attempted to "break" him by keeping him for five days and nights in the holding cell in December without basic human needs such as heat, ventilation, a toilet, running water, a change of clothing, a shower, or a sleeping mat.[13] (Compl. at 11).  Plaintiff has sued each of the nine (9) Defendants in their individual and official capacities, and seeks compensatory and punitive damages in the amount of $10,000.00 from each Defendant. [1]

On January 9, 2006 the Defendants answered, asserting, among various affirmative defenses, that Plaintiff had failed to exhaust his administrative remedies prior to filing suit. [12]

After the Defendants requested and received two extensions of time in which to file their dispositive motion, [40; 48] the Defendants filed a Motion for Summary Judgment on April 24, 2006. [53]  The undersigned issued an Order, filed on April 25, 2006, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), notifying Plaintiff of the dismissal procedure and the possible consequences if he failed to adequately respond to the Motion for Summary Judgment



---

[11]   *See* Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment [115] at p. 4; *see also* Medical Clearance for Transfer dated February 14, 2005, indicating that Plaintiff was transferred from Lieber to McCormick, attached as Exhibit 5 at p. 4 to Plaintiff's motion for summary judgment. [104]

[12]   Should a limitations issue arise, the Plaintiff will have the benefit of the holding of *Houston v. Lack*, 487 U.S. 266 (1988) with respect to the delivery date of his Complaint. [4]

[13]   As will be discussed *infra*, Plaintiff was given a sleeping mat on December 30, the fifth night he was held in the holding cell.

within thirty-four (34) days. [55] Plaintiff filed a response in opposition to Defendants' motion, and attached numerous exhibits. [63] Defendants later withdrew the Motion for Summary Judgment with leave to refile. [68] On September 5, 2006, the Defendants re-filed their Motion for Summary Judgment, accompanied by affidavits of Major Nettles, Investigator Antley, and IGC Carrington. [100-1; 100-3; 100-4; 102] The undersigned again issued a *Roseboro* order to the Plaintiff. [101] Plaintiff responded by filing a Motion for Summary Judgment. [104] The Defendants responded to Plaintiff's motion and filed affidavits by Captain Nunnally, IGC Carrington, and Investigator Antley. [106-1; 106-2; 106-4; 106-5] Significantly to the Court, the Defendants did not file affidavits by any of the other Defendants, *viz.,* Warden Burtt, AW Bodison, AW Thompson, Lt. Elka, or Dr. Smith. On December 1, 2006, the undersigned issued a Report and Recommendation which found as a threshold matter, that the Defendants did not prove that Plaintiff failed to exhaust his available administrative remedies. [117] Accordingly, the undersigned addressed the merits of the Plaintiff's case. With respect to Plaintiff's claims regarding his conditions of confinement in the holding cell, the undersigned found that there existed a genuine issue of material fact as to whether the Plaintiff's Eighth Amendment rights had been violated by the Defendants, and recommended that Plaintiff's Eighth Amendment claims be set for trial. The undersigned recommended that Plaintiff's remaining claims against the Defendants (use of excessive force by Defendant Nunnally; a due process claim regarding the grievance procedure; claims regarding inadequate medical care; and conspiracy) be denied. [117]

The Defendants and Plaintiff filed objections to the Report and Recommendation [118; 119], and by an Order filed on February 22, 2007, the District Court declined to adopt the Report and Recommendation until the exhaustion issue was resolved. To that end, the District Court denied without prejudice the pending motions for summary judgment and ordered that the parties

conduct limited discovery on the issue of whether the Plaintiff had exhausted his administrative remedies. [125] The case was remanded to the undersigned United States Magistrate Judge.

On March 8, 2007, the undersigned issued an scheduling order which directed the Plaintiff and the Defendants to engage in discovery regarding the issue of exhaustion, and set April 30, 2007 as the deadline for the filing of dispositive motions. [127] On April 30, 2007, the Plaintiff and the Defendants again filed motions for summary judgment. [133; 134] Again, the Defendants filed affidavits by Major Nettles, Investigator Antley, Captain Nunnally, and IGC Carrington, but did not file affidavits of Warden Burtt, AW Bodison, AW Thompson, Lt. Elka, or Dr. Smith.[14] On May 1, 2007, the undersigned issued another *Roseboro* order, advising the parties of the deadline for filing a response. [135] The Defendants filed their response to Plaintiff's motion on May 18, 2007 [137], and on June 4, 2007, Plaintiff filed his response in opposition to the Defendants' motion for summary judgment. [140] As the issues have been joined, this case is ripe for review.

### V.  SUMMARY JUDGMENT STANDARD

In ruling on cross-motions for summary judgment, the Court must apply the same standard as it does for individual summary judgment motions. *Creech v. N.D.T. Indus., Inc.*, 815 F.Supp. 165, 166 (D.S.C. 1993). The Court's analysis of the motions for summary judgment is governed by the holding in *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986):



---

[14]     The Affidavits of Major Nettles [134-5; 134-6], Investigator Antley [134-3], Captain Nunnally [134-7; 134-8] , and IGC Carrington [134-4] were identical to the Affidavits of those Defendants which had been filed earlier in this case.

| | |
|---|---|
| Major Nettles | 134-5 was identical to 100-3 |
| | 134-6 was identical to 118-3 |
| Investigator Antley | 134-3 was identical to 100-4 and to 106-5 |
| Captain Nunnally | 134-7 was identical to 106-2 |
| | 134-8 was identical to 118-2 |
| IGC Carrington | 134-4 was identical to 106-4 and to 102 |

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation there can be no "genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Rule 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the

summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. When Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

## VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES

As a threshold matter, the Court will address whether Plaintiff exhausted his administrative remedies prior to filing this action. The Prison Litigation Reform Act of 1996 (the "PLRA"), codified as amended at 42 U.S.C. § 1997e(a), provides in relevant part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524 (2002) ("Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory."). Thus, the PLRA requires prisoners bringing actions concerning prison conditions or other federal law to exhaust all available administrative remedies before suing in federal court. *See Porter*, 534 U.S. at 532; *Booth v. Churner*, 532 U.S. 731, 741 (2001). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, – U.S. – 127 S.Ct. 910, 918-19, 166 L.Ed.2d 798, (*citing Porter*, 435 U.S. at 524).



In *Porter*, the United States Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. In *Porter*, the Supreme Court stated that even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit. The Court stressed, as does the statute, that exhaustion must take place prior to the commencement of the civil action in order to further the efficient administration of justice:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, *Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.* In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. In other instances, the internal review might filter out some frivolous claims. And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

534 U.S. at 524-525 (emphasis added). The United States Supreme Court, in *Woodford v. Ngo*, 548 U.S. ----, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), held that to properly exhaust administrative remedies a prisoner must "complete the administrative review process in accordance with the applicable procedural rules," 548 U.S. at ----, 126 S.Ct. 2378, 165 L.Ed.2d 368. Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." *Jones v. Bock*, --- U.S. ----, 127 S.Ct. at 923. Furthermore, under *Jones v. Bock*, while no unexhausted claim may be considered under the PLRA, a case should not be dismissed in its entirety because it contains unexhausted claims. *Jones*, 127 S.Ct. at 924-25. The Supreme Court has instructed that the unexhausted claims should be dismissed and the rest of the case proceed. *Id.*



The Plaintiff's claims arise from events which began on or about December 15, 2004 and which are set forth in detail in his Complaint. Between December 31, 2004 and January 27, 2005, Plaintiff filed six (6), 10-5 Form, Step 1, grievances ("Step 1 Grievances"), including one

(1) disciplinary appeal for a rules violation conviction he received.[15]  Grievance LCI-1216-04,

dated December 31, 2004 (the "Grievance"), relates to the claims raised in the present

complaint.[16]  The Grievance was received by one of the two inmate grievance coordinators at

Lieber, on January 5, 2005,[17] and because it was construed as requesting only that "criminal

charges" be brought against Captain Nunnally, it was forwarded to the Division of Investigations

for review.[18]

Plaintiff specifically refers to the Grievance in his Complaint and in his Motion for

Summary Judgment.  He states that he never received a response to the Grievance.  Indeed,

according to an exhibit attached to the Plaintiff's Memorandum,[19] the Grievance received no

disposition–it was not upheld, resolved, or denied, or returned as unprocessed.  According to the

Defendants, grievances containing criminal allegations are forwarded immediately to the

Chief/Designee, Inmate Grievance Branch.  If it is later determined that a criminal investigation

is not required, then the grievance is processed in accordance with the procedures contained in

---

[15]  Three of the six grievances related to the alleged assault by Captain Nunnally.  SCDC policy mandates that an inmate is permitted to file only one grievance per incident or circumstance.  *See* Affidavit of Lisa Carrington ("Carrington Affidavit") [134-4] at ¶ 8.  Two other grievances (#LCI-0082-05; and #LCI-0093-05) complained about Investigator Antley's investigation of the incident.

[16]  *See* Grievance LCI-1216-04, attached to Plaintiff's Memorandum [133] as Exhibit Q; *see also* Carrington Affidavit [134-4] at ¶¶ 6-7.

[17]  *See* Grievance LCI-1216-04, attached to Plaintiff's Memorandum [133] as Exhibit Q.

[18]  *See* Defendants' Memorandum [134-2] at p. 4.

[19]  *See* computer print-out of SCDC Offender Management System, attached to Plaintiff's Memorandum [133] as Exhibit 14.  This Exhibit is a list of all grievances filed by the Plaintiff from August 8, 2003 to April 14, 2005; the list does not indicate a disposition for Grievance # LCI 1216-04, regarding "unprofessional co[nduct]."

the Inmate Grievance system policies.[20] Defendants state the Grievance is "still opened" may be

answered at any time as not subject [to] GA-01.12, § 13, et al."[21] The Defendants state:

> Plaintiff hammers on the point that he did not receive a response to his grievance, and therefore
> he should be automatically granted the right to use the Federal courts. However, his grievance
> was addressed, investigated and Plaintiff was simply not informed immediately of the
> determination. This grievance may still be answered using the SCDC grievance system, and
> Plaintiff may appeal if necessary.[22]

According to Defendants, "Plaintiff has failed to exhaust his administrative remedies" with

respect to the Grievance.[23] The Defendants appear to argue that because the Grievance remains

with the Division of Investigations, the Plaintiff's Step 1 grievance has not progressed beyond

that point, and no final agency determination has been made with regard to Grievance LCI 1216-

04. In the meantime, however, the Defendants seek to stop the Plaintiff from litigating his claim

on the grounds that he has failed to exhaust administrative remedies.

    The Defendants have provided the court with the SCDC's grievance policy/procedure in

effect at the time that the Grievance was filed.[24] Paragraph 11 states: "Under no circumstances

will the grievance process exceed 180 days." The SCDC did not provide the court with a

grievance procedure for grievances which allege that a crime was committed, as in the present

case. The Fourth Circuit has held that it is the Defendant who has the burden of showing that a


Plaintiff failed to exhaust his or her administrative remedies. *See Anderson v. XYZ Correctional

Health Services*, Inc., 407 F.3d 674, 683 (4th Cir. 2005) (inmate's failure to exhaust

administrative remedies is an affirmative defense to be both pled and proven by the Defendant).

---

[20]    *See* SCDC Policy/Procedure, GA-01.12, §15 attached as [134-16].

[21]    *See* Defendants' Table of Plaintiff's Grievances. [134-14]

[22]    Defendants' Response [137] at p. 6.

[23]    Defendants' Memorandum [134-2] at pp. 2-3.

[24]    *See* SCDC Policy GA-01.12, attached to Defendants' Memorandum. [134-16]

At this point, the Grievance has been languishing in the Division of Investigations for almost three years–since January 5, 2005. When a prisoner files a grievance and has not received a timely determination, the grievance may be considered exhausted under the PLRA. As the Seventh Circuit has observed: "we refuse to interpret the PLRA 'so narrowly as to . . . permit [prison officials] to exploit the exhaustion requirement through indefinite delay in responding to grievances.' " *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) (*quoting Goodman v. Carter*, No. 2000 C 948, 2001 WL 755137, at *3 (N.D.Ill. July 2, 2001)); *see also James v. McCall*, 2007 WL 752161 at *6 (D.S.C. March 8, 2007) (DCN-GCK) *and James v. Davis*, 2006 WL 2171082 at **13-17 (D.S.C. July 31, 2006) (DCN-GCK).[25] Likewise, in *Mattress v. Taylor*, 487 F.Supp.2d 665 (D.S.C. 2007), Judge Duffy noted:

> [T]he fact that an inmate grievance system exists does not conclusively establish that an administrative remedy is available to Plaintiff. *See Chronister v. Metts*, No. CA 2 04 22848 HMH-RSC, 2006 WL 533380, at *3 (D.S.C. Mar. 3, 2006) (" '[E]xhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance or otherwise prevent him from seeking his administrative remedies.' " (*quoting Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004))); *Taylor v. Barnett*, 105 F.Supp.2d 483, 486 (E.D.Va. 2000) (stating that the plaintiff has exhausted his available administrative remedies when he properly filed a grievance, did not receive a response, and was unable to appeal because procedure required a written resolution of claims before he could use the appeals process). As several circuits have held, a grievance may be considered exhausted under the PLRA when a prisoner files a grievance but has not received a timely determination. *See Boyd v. Corr. Corp. of America*, 380 F.3d 989, 996 (6th Cir. 2004) (concluding "administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance") ,*cert. denied*, 544 U.S. 920, 125 S.Ct. 1639, 161 L.Ed.2d 477 (2005); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) ("[W]e agree that the failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable[.]"); *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) (agreeing that administrative remedies are deemed exhausted under the PLRA when prison officials fail to respond to inmate grievances); *Foulk v. Charrier*, 262 F.3d 687, 698 (8th Cir. 2001) ("[O]nce [the prison] failed to respond to [the prisoner's written grievance], no further administrative

---

[25]    In *James*, the undersigned United States Magistrate Judge noted that "[d]efendants may . . . .be estopped from raising non-exhaustion as an affirmative defense when prison officials inhibit an inmate's ability to utilize grievance procedures." *James v. Davis*, 2006 WL 2171082 at *16, *citing Fair v. Hallman*, 2006 WL 1172198 at *5 (D.S.C. May 2, 2006) (Seymour, J.), *in turn quoting Stenhouse v. Hughes*, 2006 WL 752876 at *2 (D.S.C. March 21, 2006) (Herlong, J.), *and citing Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004).

proceedings were 'available' to him."); *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) ("A prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed and the state's time for responding thereto has expired.").

In *Mattress v. Taylor*, Judge Duffy held:

> Plaintiff has exhausted his administrative remedies. Plaintiff filed his grievance on November 13, 2004 and has yet to receive a response, despite the fact that he filed his grievance more than a year ago. His grievance is apparently still pending at SLED. *Given the amount of time that passed between the filing of his grievance, which remains unaddressed, and the filing of his complaint, the court deems Plaintiff to have exhausted his administrative remedies.*

*Mattress v. Taylor*, 487 F.Supp. at 671-672 (emphasis supplied by the undersigned).

The facts of the present case are strikingly similar to the facts of *Mattress v. Taylor*. As mentioned above, Plaintiff's Grievance was received by SCDC in January 2005 and remains open almost three years later. Given the facts of this case, and the amount of time that has elapsed, the Court is of the opinion that the Plaintiff has exhausted his administrative remedies with respect to the claims raised in the Grievance.

Finally, with respect to the nine Defendants, *Jones v. Bock* teaches that although the PLRA requires exhaustion of such administrative remedies as are available, "nothing in the statute imposes a 'name all defendants' requirement[.]" *Id.*, 127 S.Ct. at 922. Therefore, regardless of whether or not all of the Defendants were named in the Grievance, the Defendants are properly included in this action.

## VII. DISCUSSION OF PLAINTIFF'S CLAIMS

### A. Plaintiff's Request for Injunctive Relief



In his Complaint, Plaintiff seeks injunctive relief to ensure that: (1) he receives proper medical care; (2) policies are established which address the maximum amount of time an inmate is permitted to stay in a holding cell; (3) Plaintiff is "permanently separated" from all Defendants because he fears retaliatory action will be taken; (4) Defendant Nunnally is criminally charged with assault and battery of a high and aggravated nature; and (5) Warden Burtt and IGC

Carrington are "advised sternly" to follow the SCDC grievance procedures, policies, and deadlines.

To the extent Plaintiff seeks injunctive relief, it is recommended that these claims be denied as moot, because after the Complaint was filed, Plaintiff was transferred from Lieber to Lee Correctional Institution. [46] *See, e.g., Scurry v. Middleton,* 2007 WL 1068248 at *3 (D.S.C. April 2, 2007) (MBS-BM) (upon the plaintiff's release from the detention center, the plaintiff's request for injunctive and/or declaratory relief was moot); *citing Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir. 1991) ("[T]he transfer of a prisoner render[s] moot his claim for injunctive and declaratory relief."); *Taylors v. Rogers,* 781 F.2d 1047, 1048 n. 1 (4th Cir. 1986) (holding that prisoner's transfer mooted a request for declaratory and injunctive relief); *cf. Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) ("[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."); *Magee v. Waters,* 810 F.2d 451, 452 (4th Cir. 1987) (holding that the transfer of a prisoner rendered moot his claim for injunctive relief); *Buie v. Jones,* 717 F.2d 925, 927-929 (4th Cir. 1983). Based on the foregoing, it is recommended that Plaintiff's prayer for injunctive relief should be denied. Of course, although Plaintiff's transfer has mooted his request for injunctive relief, it has not mooted his prayer for money damages.

### B.  Plaintiff's Request that Criminal Charges Be Filed Against Captain Nunnally



To the extent that Plaintiff seeks to have Captain Nunnally criminally charged with assault and battery of a high and aggravated nature, Plaintiff's claim is not legally cognizable. It is well-settled that Plaintiff cannot have this Court order the criminal prosecution of Captain Nunnally because "[n]o citizen has an enforceable right to institute a criminal prosecution." *Lopez v. Robinson,* 914 F.2d 486, 494 (4th Cir. 1990) (*citing Linda R. v. Richard V.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) ("In American jurisprudence at least, a private

citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.")).

Furthermore, prosecutorial discretion does not reside in the judicial branch; the decision whether

or not to prosecute, and what charge to file or bring, generally rests within the prosecutor's

discretion. *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *see*

*also United States v. Giannattasio*, 979 F.2d 98, 100 (7th Cir. 1992).

### C.  Plaintiff's Claim that Grievance Procedures Were Not Followed

To the extent Plaintiff's complaint alleges that IGC Carrington, Investigator Antley, and

Warden Burtt violated his rights under the First Amendment (Compl. at 19, 22) in connection

with the prison's grievance process, this claim is without legal merit.  It is well-settled that prison

inmates do not have a constitutionally protected right to a grievance procedure. *See, e.g., Jones*

*v. North Carolina Prisoner's Labor Union*, 433 U.S. 119, 138 (1977) (Burger, J. concurring) ("I

do not suggest that the [grievance] procedures are constitutionally mandated."); *Adams v. Rice*,

40 F.3d 72, 75 (4th Cir. 1994) ("the Constitution creates no entitlement to [prison] grievance

procedures or access to any such procedure voluntarily established by a state.") (citations

omitted).  Because a  prison grievance procedure does not confer any substantive right upon

inmates, it does not give rise to a protected liberty interest requiring the procedural protection

provided by the Fourteenth Amendment. *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993).

Furthermore, simply because a state or local authority chooses to establish an inmate grievance

system, that choice does not confer any substantive constitutional right on the prison inmates or

pre-trial detainees covered by that system. *See Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.

1988).  As a result, even if corrections officials fail to properly apply an inmate grievance

procedure, such failure is not actionable under Section 1983. *See Spencer v. Moore*, 638 F.Supp.

315, 316 (E.D.Mo. 1986); *Azeez v. DeRobertis*, 568 F.Supp. 8, 9-11 (N.D.Ill. 1982).  Plaintiff's

Page 22 of  71

claim is without merit, and it is recommended that Defendants be granted summary judgment as to this issue.

### D.  Plaintiff's Eighth Amendment Claims

The United States Supreme Court has held: "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42 (1988).  Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979).

The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments," (U.S. Const. amend. VIII) and applies to states through the Due Process Clause of the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666-67 (1962).  The Supreme Court has held that the Eighth Amendment "serves as the primary source of substantive protection of convicted prisoners in cases . . . where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers*, 475 U.S. 312, 327 (1986).  "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); *see also Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) *and Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  The Eighth Amendment imposes certain duties upon prison officials to ensure that inmates receive adequate food, clothing, shelter and medical care, and must "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *see also Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  "Conditions within the prison may constitute cruel and unusual punishment in violation of the Eighth Amendment if they result in



an 'unquestioned and serious deprivation of basic human needs.' " *Rhodes v. Chapman*, 452

U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Only those conditions depriving inmates

of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of

an Eighth Amendment violation. *Id.*

The Supreme Court has applied the Eighth Amendment in prison cases of several

types–those that address "failure to protect", those that address "conditions of confinement" and

those that address "excessive force". Each of these will be discussed in turn.

### 1. Plaintiff's Claim that the Defendants Failed to Protect Him[26]

The Eighth Amendment protects inmates from physical harm at the hands of fellow

inmates resulting from "the deliberate or callous indifference of prison officials to specific

known risks of such harm." *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). Where it is

alleged, as in Plaintiff's action, that prison officials failed to protect an inmate from harm, the

appropriate legal standard is whether the official was deliberately indifferent to a known, specific

risk of harm. *See Moore v. Winebrenner*, 927 F.2d 1312, 1315 (4th Cir. 1991). The United

States Supreme Court and this judicial circuit have rejected a negligence standard in determining

deliberate indifference. *E.g., Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d

251 (1986); *Moore*, 927 F.2d at 1315-17. Thus, merely negligent behavior on the part of a prison

official, in failing to protect a prisoner from a risk of harm, does not present a Constitutional

violation. *See Whitley v. Albers*, 475 U.S. at 319 ("obduracy and wantonness, not inadvertence . .

. characterize the conduct prohibited by [the Eighth Amendment]"); *Davidson v. Cannon*, 474

U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (negligent failure to protect an inmate does not

---

[26]    In the first Report and Recommendation, the undersigned did not specifically address Plaintiff's claim that the Defendants failed to protect him from other inmates. Plaintiff objected to this oversight in his objections to the Report and Recommendation. The Court finds that the Plaintiff properly exhausted this claim, as he sets forth this claim in his Grievance as an underlying cause for the other occurrences of which he complains.

"deprive" him of liberty or violate the fourteenth amendment). The failure of prison officials to protect inmates from attacks by other inmates may rise to the level of an Eighth Amendment violation when: (1) the deprivation alleged is "objectively, sufficiently serious" and (2) the prison officials had a "sufficiently culpable state of mind," acting with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotations omitted). "[D]eliberate indifference entails something more than mere negligence ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835, 114 S.Ct. 1970.

In his Complaint, Plaintiff specifically alleges that the Defendants were aware of the specific risk of harm that his two fellow-inmates, Jimmy Johnson and Tony Lee, posed to him. Plaintiff told Sgt. Hamilton that Johnson and Lee had threatened his life and threatened to rob him unless he gave them $100.00 worth of items from the Lieber canteen. (Compl. at 8). After Plaintiff was released from two days in the holding cell, he was returned to the same living unit as he had been in, and thus was housed with Johnson and Lee, who soon thereafter robbed him of his wristwatch and wedding ring.

Plaintiff has alleged facts sufficient to show that the prison officials knew of the risk to Plaintiff of robbery or physical harm, and were deliberately indifferent to the risk when they denied him protective custody and returned him to the same living unit as before, where Plaintiff subsequently was robbed. "Although prison officials need not intend that a known risk will actually harm an inmate, they must intentionally ignore this known risk in order to be liable under the Eighth Amendment." *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997), *cited with approval in Lucas v. Eagleton*, 2007 WL 2457571 at *9 (D.S.C. August 23, 2007) (TLW-BM). The Court is of the opinion that the Plaintiff has presented evidence to show that "the officials act[ed] with a sufficiently culpable state of mind." *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th



Cir.), *cert. denied*, 510 U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993), *quoting Wilson v. Seiter*, 501 U.S. at 298. In the present case, Plaintiff has set forth a genuine issue of material fact as to whether the Defendants wrongfully denied Plaintiff protective custody in violation of his Eighth Amendment rights, and therefore it is recommended that this matter be set for trial.

## 2.  Conditions of Confinement

The "conditions of confinement" cases assess various acts or omissions by prison officials in the routine administration of their facilities that cause prisoners to suffer harm. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Hutto v. Finney*, 437 U.S. 678 (1978); *Rhodes v. Chapman*, 452 U.S. 337 (1981); *Wilson v. Seiter*, 501 U.S. 294 (1991); *Helling v. McKinney*, 509 U.S. 25 (1993); *Farmer v. Brennan*, 511 U.S. 825 (1994). Routine discomfort is part of the penalty that convicted prisoners pay for having committed crimes. *Rhodes v. Chapman*, 452 U.S. at 347. Consequently, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The "conditions of confinement" and "excessive force" cases require, to different degrees, the satisfaction of both an objective and subjective component for establishing an Eighth Amendment violation. Thus, to prove a violation of the Eighth Amendment, an inmate must show: (1) objectively, that the deprivation alleged is "objectively sufficiently serious" such that the plaintiff was denied "the minimal civilized measure of life's necessities;" and (2) subjectively, that the defendant officials possessed a "sufficiently culpable state of mind" associated with "the unnecessary and wanton infliction of pain." *Farmer v. Brennan*, 511 U.S. at 834.



## a.  The Objective Component

To satisfy the objective component, a prisoner is required to demonstrate an "extreme" deprivation. *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997). Specifically, a plaintiff must

allege facts sufficient to show either that he has sustained a serious or significant mental or physical injury as a result of the challenged conditions or that the conditions have created an unreasonable risk of serious damage to his future health. *Strickler v. Waters*, 989 F.2d 1375, 1380-1381 (4th Cir.), *cert. denied*, 510 U.S. 949, 1 (1993); *Helling v. McKinney*, 509 U.S. 25 (1993). With regard to the objective component, that the alleged deprivation be "objectively sufficiently serious," a court must consider whether the correctional officers' actions, taken contextually, were objectively harmful enough to offend contemporary standards of decency. *See Hudson v. McMillian*, 503 U.S. 1, 6 (1993). A condition of harm is sufficiently serious if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society . . . or which involve the unnecessary or wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. at 102-03. With respect to showing whether prison conditions objectively pose a significant risk of serious harm, the court in *Wilson v. Seiter* explained:

> some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets.

*Wilson v. Seiter*, 501 U.S. at 304-05.

### b. The Subjective Component

Next, the subjective element is satisfied when the prisoner alleges facts which show that prison officials acted with "deliberate indifference" (*Strickland*, 989 F.2d at 1379), or with a "sufficiently culpable state of mind" (*Strickler v. Waters*, 989 F.2d at 1379, *quoting Wilson*, 501 U.S. at 298). With respect to the subjective prong of the Eighth Amendment test, it is clear that once the responsible prison official becomes aware that conditions at his facility are depriving inmates of one or more basic human needs, that official must take corrective action. *Brown v. Mitchell*, 327 F.Supp.2d 615, 650 (E.D.Va. 2004); *Wilson*, 501 U.S. at 300; *Strickler*, 989 F.2d at 1382; *Williams v. Griffin*, 952 F.2d 820, 826 (4th Cir. 1991). Not to take corrective action would



Page 27 of 71

show, with respect to the subjective element of an Eighth Amendment analysis, that Defendants were deliberately indifferent to Plaintiff's needs.

In *Farmer*, the Supreme Court held that the crucial question was whether a prison official knew of and disregarded an excessive risk to an inmates's health or safety. *Farmer*, 511 U.S. at 837. The Court added that "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm." *Id.* at 842. The subjective element test was discussed in *Whitley v. Albers*, 475 U.S. 312 (1986), a case where an inmate, shot by a guard during an attempt to quell a prison disturbance, contended that he had been subjected to cruel and unusual punishment. The Court in *Whitley* held:

> After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment. To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety . . . . It is *obduracy and wantonness, not inadvertence or error in good faith*, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.[27]
>
> These cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment.[28]

Thus, with respect to the subjective part of the test, the undersigned must review the record to determine whether the Defendants knew that their conduct involved more than a lack of due care, and whether their actions were taken with "obduracy and wantonness, not inadvertence or error in good faith".



In summary, then, the Plaintiff must make two showings in order to state a viable Eighth Amendment conditions-of-confinement claim. The first showing requires the court to determine whether the deprivation of a basic human need was objectively "sufficiently serious", while the

---

[27]    *Wilson v. Seiter*, 501 U.S. at 298-99; *quoting Whitley*, 501 U.S. at 319 (emphasis added in the original, and citations and internal quotation marks omitted).

[28]    *Wilson v. Seiter*, 501 U.S. at 299 (footnote and internal citation omitted).

second requires it to determine whether the officials subjectively acted with "wantonness" or with a "sufficiently culpable state of mind." *Strickler v. Waters*, 989 F.2d at 1379, *quoting Wilson*, 501 U.S. at 298.  Plaintiff's claims will be examined under this paradigm of analysis.

### c. Application of the Objective and Subjective Components

### i. Lack of a Sleeping Mat or a Blanket

Plaintiff contends that he did not have a sleeping mat or mattress for the first two days he was in the holding cell (December 15-17, 2004), or for four (4) of the five (5) subsequent nights he was kept in the holding cell (December 25-30, 2004).  Plaintiff has obtained sworn declarations from three other inmates, Donyell Gadson (#235562), Huey Williams (#258602), and Daniel Barnes (#285979), who have been held in Lieber's holding cell at various times, confirming Plaintiff's allegation that mattresses are not given to inmates while in the holding cell, and the inmates must sleep on the concrete floor.[29]

Major Nettles admits that he adopted a practice not to give mattresses to inmates in the holding cell, but that Plaintiff was given a mattress at some unspecified time while kept in the holding cell.[30]  It appears from Captain Nunnally's Affidavit that the Plaintiff had a mattress or mat on the evening of December 29, because Captain Nunnally ordered that the mats be removed from the holding cell some time after 6:00 a.m. on December 30, 2004.[31]  Captain Nunnally's Supplemental Affidavit does not provide any additional, more specific information as to the date that the Plaintiff might have received a sleeping mat.  Thus, the Defendants do not provide any



---

[29]    *See* Declaration of Donyell Gadson (#235562) at ¶ 4, attached as Exhibit GGG to Plaintiff's motion for summary judgment [104]; *see also* Declaration of Huey Williams (#258602) at ¶ 3, attached as Exhibit WWW to Plaintiff's motion for summary judgment [104]; and Declaration of Daniel Barnes(#285979) at ¶ 4, attached as Exhibit 4 to Plaintiff's motion for summary judgment.  [104]

[30]    Nettles Supplemental Affidavit [134-6] at ¶¶ 16-18.

[31]    Nunnally Affidavit [134-7] at ¶¶ 7-11.

evidence that the Plaintiff had a mattress or sleeping mat on December 25, 26, 27, or 28. Captain Nunnally stated that the Plaintiff had a sleeping mat on December 29, and it was removed on the morning of December 30. Investigator Antley stated in his report that the Plaintiff was not given a sleeping mat until the night of December 29.[32] Thus, based upon the evidence presented by both parties, the court finds as a fact that the Plaintiff did not have a sleeping mat or mattress for four (4) of five (5) successive nights in the holding cell.[33]

Applying the two-part test of whether Plaintiff has established a constitutional violation, the Court first notes objectively that sleep can constitute a basic human need. *See, e.g., Harper v. Showers,* 174 F.3d 716, 719 (5th Cir. 1999) ("[S]leep undoubtedly counts as one of life's basic needs. Conditions designed to prevent sleep, then, might violate the Eighth Amendment."). Second, under a subjective standard, there exists a question as to whether the policy of denying inmates sleeping mats at night in the holding cell is justified by a legitimate penological interest (as Captain Nunnally states)[34] or is, as Plaintiff argues, is part of a "policy" to "break" inmates by subjecting them to inhumane conditions.[35] In support of this argument that the holding cell was

---

[32]    Investigative Report by Greg Antley, dated January 12, 2005, attached as Exhibit 15 to Plaintiff's motion for summary judgment. [133]

[33]    Although Plaintiff contends he did not have a sleeping mat or mattress for the time period from December 15-17, 2004, this issue was not grieved through the administrative process and therefore will not be addressed by the undersigned.

[34]    Nunnally Supplemental Affidavit [134-8] at ¶ 9 ("We had found that inmates were putting contraband in their mats.").

[35]    Plaintiff states:
>    Defendants Burtt, Nettles, Thompson, Bodison and Nunnaly routinely place inmates in Lieber holding cell for days who for whatever reason request protective custody. This is done to break inmates down so they'll return to general population. Upon information and belief, Defendants Burtt, Nettles, Thompson, Bodison and Nunnaly have a policy, either written or implied to keep inmates in holding cell for long periods instead of placing inmate on protective custody. Placement in holding cell involves lack of proper ventilation, no toilet or bath facilities, no running water, a small wood bench and hard floor are [the] only accommodations, and it's extremely cold. (Compl. at 7).

used to "break" inmates, Plaintiff has provided a copy of his medical records which indicate that on December 28, 2004, during his time in the holding cell, he was seen by Dr. Cusack of Lieber's Mental Health Clinic. Plaintiff stated: "I think I'm having a nervous breakdown."[36] Dr. Cusack noted Plaintiff had "anxious and depressive symptoms [which] have escalated together with paranoid symptoms" and noted: "Counselors need to follow closely."[37] Plaintiff also has provided the court with a sworn statement from another inmate incarcerated at Lieber during 2002-2003 who sought protection from other inmates and had spent three days and nights, and then, seven days and nights in the holding cell as a result of the Defendants' tactics to "break" inmates from seeking protection from other inmates.[38] Thus, a genuine issue of material fact exists as to the reasons Plaintiff was not allowed a mattress in the holding cell for four nights–whether it was an attempt by Defendants to "break" inmates, or whether it is due to a legitimate penological interest.

In addition to a lack of mattress for four nights, Plaintiff states that while he was in the holding cell from December 25-29, he was "cold and shaking" and had no clothing except for what he was wearing. (Compl. at 11). He asked Lt. Elka for a blanket, but Lt. Elka refused to give him a blanket. (Compl. at 11). As mentioned above, an affidavit from Lt. Elka was not submitted to the Court. Other inmates who have been held in the Holding Cell have executed sworn statements confirming that sheets and blankets are not provided to inmates while in the

---

[36]    See Exhibit 6 to Plaintiff's motion for summary judgment. [104]

[37]    See Exhibit 6 to Plaintiff's motion for summary judgment. [104]

[38]    See Sworn Declaration of Daniel Barnes (#285979) at ¶¶ 4-5, attached as Exhibit 4 to Plaintiff's motion for summary judgment. [104]

holding cell.[39]  The court finds as a fact that the Plaintiff did not have a blanket while in the

holding cell.

Whether the Plaintiff needed a blanket due to the temperature in the holding cell is in

dispute.  Major Nettles states by affidavit that the holding cell measures 19 feet by 14.5 feet[40] and

on December 8, 2006, when he measured the holding cell, the temperature of the holding cell

"felt exactly the same as the temperature inside of my office and the entire Operations building.

It is warm in the cell even on a cold December day."[41]  Captain Nunnally states by affidavit that

"[t]he holding cells are the same temperature as the entire Operations building, where the

Warden, the Major, and I work all day.  The temperature is climate controlled."[42]  The Court

finds there exists a genuine issue of material fact as to the temperature of the holding cell from

December 25-30, 2004.

With respect to the subjective component of this test, Plaintiff contends that he asked Lt.

Elka for a blanket, but Lt. Elka refused to give him one.  *Id.*  Also during the time Plaintiff was in

the holding cell, Plaintiff saw and spoke to Warden Burtt, AW Bodison, AW Thompson, and

Major Nettles, and told each of these Defendant that he was cold because he did not have a

blanket.  None of these Defendant provided him with a blanket, or directed anyone else to give

---

[39]  *See* Declaration of Donyell Gadson (#235562), attached as Exhibit GGG to Plaintiff's motion for summary judgment [104]; *see* Declaration of Daniel Barnes (#285979) at ¶ 4, attached as Exhibit 4 to Plaintiff's motion for summary judgment.  [104]

[40]  Nettles Supp. Affidavit [134-6] at ¶ 7.

[41]  Nettles Supp. Affidavit [134-6] at ¶ 9.  Major Nettles does not specifically state the internal temperature of Lieber's holding cells in the wintertime, or the type of clothing that Plaintiff would have been wearing.  Such information would have been useful to the court's analysis.  *Cf. Jeter v. Powers*, 2007 WL 1174174  at *3 (D.S.C. April 17, 2007) (Defendants provided an affidavit to the court as follows:  "Powers [the Director of the Spartanburg County Detention Center] states that internal temperatures at the SCDF are set between 72 and 74 degrees in the summer and 75 and 78 degrees in the winter and each inmate is issued a full set of clothing with a military-style coat.  Powers Aff., Para. 9.").

[42]  Nunnally Supp. Affidavit [118-2] at ¶ 11.

him a blanket. *Id.* Thus, these Defendants knew that the Plaintiff was cold, and Plaintiff alleges that they acted with deliberate indifference.[43] The Defendants do not contend that denying the Plaintiff a blanket serves a legitimate penological interest.

The Supreme Court has recognized that some conditions, which taken singly do not constitute cruel or unusual punishment, may in cumulative effect violate the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991) (citing low nighttime cell temperature plus a failure to issue blankets as an example). The court finds that there is a genuine issue of material fact as to whether the temperature in the holding cell was cold enough to require the Defendants to provide a blanket to Plaintiff, so that the Defendants' failure to provide a blanket would violate Plaintiff's Eighth Amendment rights.

The Court must view the allegedly cold temperatures, lack of blankets or additional clothing, and lack of sleeping mats as a whole. "That a totality of prison conditions can be combined to show an Eighth Amendment violation is a proposition established in many cases." *Williams v. Griffin*, 952 F.2d 820, 826 (4th Cir. 1991). The Supreme Court in *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (emphasis added) observed that conditions of confinement, "alone or *in combination*" may unconstitutionally  deprive inmates of minimum necessities. Other courts have readily adopted the totality of circumstances analysis when examining the constitutionality of prison conditions under the Eighth Amendment. *See, e.g., Tillery v. Owens*, 907 F.2d 418, 426 (3rd Cir. 1990) ("in determining whether conditions of confinement violate the Eighth Amendment we must look at the totality of the conditions within the institution"); *Gillespie v. Crawford*, 833 F.2d 47, 50 (5th Cir. 1987), *reinstated, in part, en banc*, 858 F.2d 1101 (5th Cir. 1988) (numerous deficient prison conditions, considered together, state a claim under Section 1983); *Hite v. Leeke*, 564 F.2d 670,

---

[43]     Plaintiff's Motion [29] at p. 8.

673 (4th Cir. 1977) (finding no unconstitutional overcrowding and recognizing that, in this case,

overcrowding was not part of a larger problem of unsanitary conditions, giving rise to the

"totality of conditions approach").

The Supreme Court, in *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 2327, 115 L.Ed.2d

271 (1991), narrowed somewhat the "totality of conditions" approach.  In *Wilson*, the Court

noted:

> Some conditions of confinement may establish an Eighth Amendment violation "in combination"
> when each would not do so alone, but only when they have a mutually enforcing effect that
> produces the deprivation of a single, identifiable human need such as food, warmth, or
> exercise-for example, a low cell temperature at night combined with a failure to issue blankets[.]

The Court concludes that Plaintiff has shown that, objectively, the Defendants violated

his rights under the Eighth Amendment with respect to conditions of confinement.  Plaintiff was

housed in a cell for four days (from December 25 to December 29) without a mattress, a blanket,

or any extra clothing, during one of the coldest months of the year.  The Fourth Circuit has found

that conditions similar to those at bar violate the Eighth Amendment.  In *Matherly v. Smith*, 813

F.2d 402 (Table) (4th Cir. 1986) *(per curiam)* Judges Sprouse, Ervin and Chapman observed,

with respect to a pre-trial detainee, "[a]lthough we express no view on the merits, we believe



Matherly's allegation that he was confined in an isolation cell with no clothing or bedding for

two days states a claim of unconstitutional conditions in violation of the due process clause."

*Matherly, citing Bell v. Wolfish*, 441 U.S. 520 (1979); *see also Johnson v. Williams*, 788 F.2d

1319 (8th Cir. 1986) (eighth amendment violation found where prisoner in quiet cell for 18 hours

on two occasions with no clothing or bedding).  Likewise, in *O'Connor v. Keller*, 510 F.Supp.

1359, 1372, 1375 (D.Md. 1981), the court found an Eighth Amendment violation where a

prisoner was kept in an isolation cell for 48 hours without a mattress, blanket, toilet paper, or, for

part of the time, clothing.  As another example, in *McCray v. Burrell*, 516 F.2d 357 (4th Cir.

1975) (en banc), *cert. dismissed*, 426 U.S. 471 (1976), a suspected mental patient challenged the

conditions of an isolated confinement ("IC") area and mental observation ("MO") cell. The prisoner was held in the IC without clothes, blankets, or heat, and had only a deteriorated mattress. The MO was a barren cell, without a blanket, mattress, sink, or running water, and contained a toilet encrusted with fecal matter. The prisoner was held in both areas for approximately forty-eight hours. The Fourth Circuit found both conditions violated the Eighth Amendment, despite the relatively short duration of time.

In the present case, the Plaintiff was imprisoned in the holding cell for four days (from December 25 to December 29) without a sleeping mat or mattress. If forty-eight hours of confinement without a sleeping mat violated the Eighth Amendment in *McCray*, then approximately twice that time (four nights), in the analogous conditions at bar, evoke the same constitutional concerns. In light of *McCray*, the court finds that at the time of the confinement, the Plaintiff's right to these items in this specific circumstance was "clearly established." The court concludes that Plaintiff has shown that, objectively, the Defendants violated his rights under the Eighth Amendment with respect to conditions of confinement.[44]

Whether the Defendants subjectively violated Plaintiff's Eighth Amendment rights by denying him these items is not clear, and the Court finds a genuine issue of material fact exists as to whether the Defendants acted with deliberate indifference to the Plaintiff in this regard.



---

[44] Defendants refer this court to several cases in support of their argument that Plaintiff has failed to state an Eighth Amendment claim regarding the conditions of confinement: *Fowler v. Graham*, 478 F.Supp. 90 (D.S.C. 1979) (holding prison officials have the right to conduct random shakedowns of cells and such shakedowns do not amount to a violation of a prisoner's constitutional rights); *Hendricks v. Galloway*, 2004 WL 3090229 (D.S.C. 2004) (holding plaintiff must show he suffered serious or significant physical or emotional injury as a result of the living conditions); *Sweet v. S.C. Dept. of Corrections*, 529 F.2d 854 (4th Cir. 1975) (denial of a shower for five or several days would be a *de minimis* violation of sanitary requirements). However, the court finds these cases inapposite to the facts at hand, and therefore unpersuasive.

### ii. Lack of Ventilation

The Eighth Amendment applies to prisoner claims of inadequate ventilation, because it is a distinct prison condition. *Chandler v. Crosby*, 379 F.3d 1278, 1294 (11th Cir. 2004); *see also Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996) (stating the Ninth Circuit's rule that "[i]nadequate ventilation and air flow violates the Eighth Amendment if it undermines the health of inmates and the sanitation of the penitentiary."). Plaintiff contends there "are no vents for heat or air" in the holding cell.[45] Significantly, another inmate has stated: "[I]t is at times hard to breath[e]."[46] If inmates in the holding cell had trouble breathing, it appears, objectively, that this could constitute an excessive risk to an inmates's health or safety. *Farmer*, 511 U.S. at 837.

The question, then, is whether prison officials knew of and disregarded an excessive risk to an inmate's health or safety. *Farmer*, 511 U.S. at 837. According to Major Nettles, the holding cell is ventilated in the same way as any other room in the Operations building.[47] Major Nettles experiences no difficulty breathing when he is inside the holding cell.[48] Captain Nunnaly states that "[t]he cells are not airtight, and air constantly flows through the vents."[49] The Court finds that there exists a genuine issue of material fact as to whether there was ventilation in the holding cell. As this is a disputed factual issue, it is not subject to summary judgment.



---

[45]    Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment [140] at p. 2.

[46]    Declaration of Daniel Barnes(#285979) at ¶ 4, attached as Exhibit 4 to Plaintiff's motion for summary judgment.  [104]

[47]    Supplemental Affidavit of Major Nettles [134-7] at ¶ 13.

[48]    Nettles Supplemental Affidavit [134-7] at ¶ 12.

[49]    Nunnally Supplemental Affidavit [118-2] at ¶ 12.

### iii.  Constant Lighting in the Holding Cell

Plaintiff alleges that the lights in the holding cell were on 24 hours a day, and he did not

sleep for the five days he was in the holding cell.  (Compl. at 10).  More specifically, he alleges

injury in that "the lights stay on all day and all night so there is no sleep.  This is how they punish

those who seek protection at Lieber CI."[50]  In support of this allegation regarding the constant

illumination in the holding cell, Plaintiff has provided the court with the sworn declaration of

Huey Williams (#258602), which states that he was placed in the Lieber holding cell "on

numerous occasions for different reasons" and "was made to stay in the Holding Cell six days"

and "the lights stay on in the cell 24 hours a day[.]"[51]  In addition, Plaintiff has provided the

Court with a sworn declaration from Randall Adam King (#302262) stating that during the four

days and four nights he was held in the Lieber holding cell, "[t]he lights stayed on all day & night

[and] I never slept."[52]  Plaintiff also has provided the Court with a sworn declaration from Inmate

Daniel Barnes (#285979) who stated:  "It is impossible to sleep exspecially [sic] because the

lights stay on all day & night."[53]

Applying the two-part test of whether Plaintiff has established a constitutional violation

by the Defendants, the Court first notes, again, that objectively, sleep can constitute a basic

human need.  *See, e.g., Harper v. Showers,* 174 F.3d 716, 719 (5th Cir. 1999) ("[S]leep

undoubtedly counts as one of life's basic needs.  Conditions designed to prevent sleep, then,



---

[50]     Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment [140] at p. 2.

[51]     *See* Declaration of Huey Williams (#258602) at ¶ 2, 3, and 5, attached as Exhibit WWW to Plaintiff's motion for summary judgment.  [104]

[52]     *See* Declaration of Randall Adam King (#302262) at ¶ 2, attached as Exhibit YY to Plaintiff's Rebuttal to Motion to Dismiss.  [47]

[53]     Sworn Declaration of Daniel Barnes (#285979) at ¶ 4, attached as Exhibit 4 to Plaintiff's motion for summary judgment.  [104]

might violate the Eighth Amendment."). Second, under a subjective standard, there is no argument set forth by the Defendants that the policy of keeping the holding cell illuminated for 24 hours a day is justified by a legitimate penological interest, or whether it is a result of deliberate indifference, or maliciousness. The Eighth Amendment "always stands as a protection against" such "calculated harassment unrelated to prison needs." *Hudson v. Palmer*, 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). It has been held that "[t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination." *LeMaire v. Maass*, 745 F.Supp. 623, 636 (D.Or. 1990), *vacated on other grounds by* 12 F.3d 1444, 1458-59 (9th Cir.1993); *see also Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996) (holding that an allegation "that large florescent lights directly in front of and behind [an inmate's] cell shone into his cell 24 hours a day, so that his cell was 'constantly illuminated, and [he] had no way of telling night or day,' and that this condition caused him 'grave sleeping problems' and other mental and psychological problems" was sufficient to state a claim of cruel and unusual punishment); *but see O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) (noting holding that continuous lighting in a holding cell was not unreasonable given the need for jail security and the need to monitor the prisoner); *King v. Frank*, 371 F.Supp.2d 977, 984-85 (W.D.Wis. 2005) (holding that constant illumination of cell by 9-watt fluorescent light was Constitutionally permissible where policy is based on legitimate prison security concerns); *Wills v. Terhune*, 404 F.Supp.2d 1226, 1230-31 (E.D.Cal. 2005) (holding that 24-hour illumination by 13-watt bulb was not objectively unconstitutional).

The Court's review of caselaw addressing whether 24 hour lighting in a cell constitutes a violation of the Eighth Amendment indicates that whether a constitutional violation obtains is dependent upon the particular facts of the case. *See, e.g., Shepherd v. Ault*, 982 F.Supp. 643, 647 (N.D.Iowa 1997) (setting forth an extensive survey of caselaw concerning the issue of 24 hour

Page 38 of 71

cell illumination). As mentioned above, Warden Burtt, AW Bodison, AW Thompson, and Lt. Elka have not submitted any affidavits with respect to this case. Captain Nunnally's Affidavit and Supplemental Affidavit [134-7; 134-8] do not mention the 24 hour lighting in the holding cell. Similarly, Major Nettles' Affidavit and Supplemental Affidavit [134-5; 134-6] do not mention the 24 hour lighting issue. Affidavits submitted by Investigator Antley [134-3] and IGC Carrington [134-4] do not mention this issue. The Court recommends that the facts of this issue be developed and recommends that this part of the conditions of confinement claim be set for trial.

### iv. Lack of Toilet or Running Water in the Holding Cell, Lack of Showers, Soap, Hygiene items, and Changes of Clothing

Plaintiff contends that Warden Burtt, AW Bodison, AW Thompson, Major Nettles, and Captain Nunnally routinely place inmates in the holding cell for days, even though the holding cells are designed to keep inmates only for short periods of time, because the holding cell is bare except for a wooden bench and does not have a toilet, sink, or running water. (Compl. 7-8). It appears undisputed that the holding cell does not have a toilet or running water.[54]

That being said, the Plaintiff contends that he was denied access to a toilet, as needed, during his five-day stay in the holding cell. Plaintiff states he had to use Styrofoam cups or his food trays as a toilet, and that the Defendants were aware of this, because Plaintiff "talked to these Defendants [Warden Burtt, AW Bodison, AW Thompson, and Major Nettles] numerous times they saw my conditions, they saw the stacked up food trays & cups I was forced to use the bathroom in and they did nothing."[55] Plaintiff specifically contends Warden Burtt, AW Bodison,



---

[54]    See Sworn Declaration of Donyell Gadson (#235562) at ¶ 3, attached as Exhibit GGG to Plaintiff's response [63-3] at p. 2.

[55]    See Compl. [1] at p. 12; Plaintiff's Response [140] at p. 3.

AW Thompson, Major Nettles and Lt. Elka were deliberately indifferent to his living conditions and safety and well being. (Compl. at 12).

Captain Nunnally states that Plaintiff "was taken to the restroom as needed."[56] Major Nettles states that the Plaintiff "was taken to the restroom as necessary and reasonable, which was as often as three times in one night[.]"[57] Major Nettles further states that Plaintiff "was never instructed to relieve himself in a meal tray or a Styrofoam cup. My impression is that if he did those things it was to incite the officers and staff."[58] The Court finds that a genuine issue of material fact exists as to Plaintiff's claim as to whether he was denied the use of a toilet during his time in the holding cell.

Next, Plaintiff contends he did not have any hygiene items (such as toothpaste or a toothbrush) while in the holding cell, or any change of clothing. (Compl. at 8, 11, 12, 13). Plaintiff has presented the sworn declaration of another inmate, Donyell Gadson (#235562), who states he had been held in the Lieber holding cell "numerous times for days [and] one time more than three (3) days"[59] but was "never given any shower, soap or change of clothes."[60] Plaintiff also has presented the sworn declaration of inmate Daniel Barnes (#285979), who states he had



---

[56]    Nunnally Supplemental Affidavit [134-8] at ¶ 14. In support of their argument that inmates in the holding cell were taken to the restroom frequently, the Defendants have filed with the court written statements from Captain Brightharp [134-9; 134-12], Officer Bowman [134-10; 134-12], Lt. Sheppard [134-11; 134-12], Sgt. Lewis [134-12], and Sandra Brenner [134-12] (rank unknown). As a threshold matter, the statements from Brightharp, Brown, and Sheppard are duplicates. More importantly, however, although these statements were filed as "Affidavits," the statements are neither sworn under penalty of perjury nor notarized. Therefore, the Court has not relied upon these statements in evaluating the Defendants' case.

[57]    Nettles Affidavit [134-5] at ¶¶ 14-15.

[58]    Nettles Supplemental Affidavit [134-6] at ¶ 19.

[59]    See Declaration of Donyell Gadson (#235562) at ¶ 2, attached as Exhibit GGG to Plaintiff's response [63-3] at p. 2.

[60]    Id. at ¶ 3.

Page 40 of 71

been held in the Lieber holding cell once for three days, and once for seven days without a shower, or "hygiene materials such as soap, toothpaste, toothbrush, deodorant, washcloth, or towel."[61]  Plaintiff also has provided the Court with the sworn declaration of Huey Williams (#258602), who states that inmates do not have toothpaste, a toothbrush, or a change of clothes while in the holding cell.[62]  The Defendants do not specifically respond to the Plaintiff's allegation that inmates held in the holding cell are not given changes of clothing or hygiene items.  The Court finds that the Defendants have conceded this portion of Plaintiff's conditions of confinement claim.

Defendants disagree with Plaintiff's claim that he was not allowed to shower during the time he was in the holding cell, from December 25, until December 30.  Major Nettles states that the Plaintiff "was taken to the shower facility ever[y] other day, separate from other inmates."[63]  In a supplemental affidavit, Major Nettles states that Plaintiff "was taken to the shower facility at least ever[y] other day, separate from other inmates because we were still determining if other inmates were in fact a danger to him."[64]  Major Nettles also states that on December 30, 2004, he directed Officer McCommons to take Plaintiff for a private shower at the infirmary.[65]  The Court finds that a genuine issue of material fact exists with respect to whether inmates held in the holding cell are deprived of showers, and recommends that this portion of the conditions of confinement claim be set for trial.



---

[61]     Sworn Declaration of Daniel Barnes (#285979) at ¶ 4, attached as Exhibit 4 to Plaintiff's motion for summary judgment.  [104].

[62]     *See* Declaration of Huey Williams (#258602) at ¶ 3, attached as Exhibit WWW to Plaintiff's response [63-3] at p. 14.

[63]     Nettles Affidavit [134-5] at ¶¶ 14-15.

[64]     Nettles Supp. Affidavit [134-6] at ¶ 20.

[65]     Nettles Affidavit [134-5] at ¶ 24.

### 3. Excessive Force Claims

It is well established that the use of excessive force upon an inmate by correctional officers violates the Eighth Amendment's prohibition against cruel and unusual punishment. *Hudson v. McMillian*, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Whitley v. Albers*, 475 U.S. 312 (1986). The excessive force cases also require the satisfaction of both an objective and subjective component for establishing an Eighth Amendment violation. Thus, to state an excessive force claim, an inmate must show: (1) that the correctional officers acted with a sufficiently culpable state of mind, and (2) that the harm inflicted on the inmate was sufficiently serious. *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).

The PLRA specifically provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). By its plain terms, Section 1997e(e) bars relief for "mental or emotional injury," but does not otherwise limit the relief available to prisoners for Eighth Amendment violations. Thus, in order to establish his claim for compensatory damages under Section 1983, a plaintiff must establish that defendants' actions were a proximate cause of plaintiff's alleged, and identifiable, physical injury. The PLRA does not define "physical injury" and the Fourth Circuit has not ruled on the issue, but the Fifth Circuit held that "physical injury" must be more than *de minimis*, but need not be significant. *Siglar v. Hightower*, 112 F.3d 191 (5th Cir. 1997) (concluding that a sore, bruised ear lasting for three days was de minimis and failed to meet the requisite physical injury to support a claim of emotional or mental suffering).



As mentioned above, the determination of whether cruel and unusual punishment has been inflicted on a prisoner in violation of the Eighth Amendment requires analysis of subjective and objective components. *See Wilson v. Seiter*, 501 U.S. 294, 302, 111 S.Ct. 2321, 115 L.Ed.2d

271 (1991). First, the objective portion of an excessive force claim requires a prisoner to show that the injury inflicted was sufficiently serious. Although a plaintiff need not show a significant injury, *see Hudson v. McMillian*, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), the Fourth Circuit, in *Norman v. Taylor*, 25 F.3d 1259 (4th Cir. 1994), (en banc), *cert. denied*, 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995) held that "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is de minimis." *Norman v. Taylor*, 25 F.3d at 1263. Because a de minimis injury may serve as evidence that de minimis force was used, an excessive force claim should not lie where a prisoner's injury is de minimis. *See id.* at 1262-63. With only de minimis physical injury, a prisoner may only recover if the challenged conduct resulted "in an impermissible infliction of pain" or was otherwise "of a sort repugnant to the conscience of mankind." *Id.* at 1263 n. 4. The Fourth Circuit has explained:

> We recognize that there may be highly unusual circumstances in which a particular application of force will cause relatively little, or perhaps no, enduring injury, but nonetheless will result in the impermissible infliction of pain. In these circumstances, we believe that either the force will be "of a sort repugnant to the conscience of mankind," and thus expressly outside the de minimis force exception, or the pain itself will be such that it can properly be said to constitute more than de minimis injury.

*Id.* at 1263, n. 4.



Absent the most extraordinary circumstances, an inmate must provide proof of more than de minimis injury. *Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir. 1994) (en banc). "De minimis injury can serve as conclusive evidence that de minimis force was used." *Riley v. Dorton*, 115 F.3d 1159, 1168 (4th Cir. 1997). In *Taylor v. McDuffie*, 155 F.3d 479, 484 (4th Cir. 1998) (en banc), *cert. denied*, 525 U.S. 1181, 119 S.Ct. 1121, 143 L.Ed.2d 115 (1999)), the Fourth Circuit noted that "temporary swelling and irritation is precisely the type of injury this Court considers de minimis[;]" therefore, abrasions on the wrists and ankles, and "tenderness over some ribs", were de minimis injuries as supported by the fact that the plaintiff did not seek

medical treatment "for at least 12 hours after the incident." 155 F.3d 484-85. It was held that "no reasonable jury could conclude that [plaintiff's] injuries were more than de minimis." *Id.* at 485; *see also Stanley v. Hejirika*, 134 F.3d 629, 637-38 (4th Cir. 1998) ("bruising of his right arm, left jaw, left and right wrists and back, and a tooth which was loosened" constituted de minimis injury); *but see, Watford v. Bruce*, 126 F.Supp.2d 425 (E.D.Va. 2001) (holding that where prison officials maliciously and unprovokedly use force to cause harm, inmates need not present evidence of significant injury to state a cause of action under Section 1983).

To the extent that the that the Defendants contend they are entitled to summary judgment because Plaintiff's injuries were de minimis, the Court disagrees. Although it is generally true that an inmate cannot prevail on a claim of excessive force under 42 U.S.C. § 1983 if the injuries sustained were de minimis, *Norman v. Taylor*, the determination of whether a sustained injury rises above the threshold level of de minimis requires a case by case analysis. *Watford v. Bruce*, 126 F.Supp.2d 425 (E.D.Va. 2001). In the present case, the Court finds that the Plaintiff has presented evidence which indicates he suffered an injury which clearly rises about the de minimis threshold. As will be addressed in greater detail below, Plaintiff contends that Captain Nunnally's use of force caused "an approximately six (6) inch rectangular shaped bruise on Pellum's lower left back near his kidney;"[66] he has been passing blood in his urine for over a year after the altercation;[67] he has continued to suffer pain, he has possible sciatic nerve damage to his left leg and back,[68] and consequently underwent an invasive urology test performed by Dr. Pinto,

---

[66]    Investigator Antley described the bruise in his report dated January 6, 2005. Antley's report is attached to Plaintiff's response [116] field with the court.

[67]    *See, e.g.,* Plaintiff's medical records summarized at pp. 50-62 *infra* regarding Plaintiff's constant hematuria.

[68]    Plaintiff's Response in opposition to defendants' motion for summary judgment [140] at p. 6.

a urologist at West Mark Surgical, on March 20, 2006.[69] In a sworn statement, Plaintiff states that Dr. Pinto told him he had seen two broken blood vessels which were the cause of Plaintiff's pain and the blood in his urine, and prescribed medicine to try to stop the bleeding.[70] The Court concludes that Plaintiff's injuries are not de minimis.

Plaintiff alleges that Captain Nunnally used excessive force when he kicked Plaintiff without provocation in his back while Plaintiff was rising to his knees from his sleeping mat. More specifically, Plaintiff claims that Captain Nunnally "maliciously and sadistically" applied "excessive physical force" for no other reason than to cause harm, and thereafter denied him medical attention, and was deliberately indifferent to his safety and well-being. (Compl. at 13). The Court finds that there exists a genuine issue of material fact regarding whether Captain Nunnally kicked Plaintiff. Captain Nunnally denies having "a physical confrontation" with Pellum, and states he "never assaulted or battered Pellum."[71] However, the Court notes that the Plaintiff has consistently stated, numerous times, that Captain Nunnally kicked him in the back on the morning of December 30, 2004. In further support of his allegation, Plaintiff has presented the sworn statement Brian Evans, the other inmate in the holding cell, which states: "I personally witnessed SCDC employee Captain Nunnaly kick Aaron Pellum in his back on the morning of December 30, 2004."[72] In another sworn statement, Evans states:



> On the morning of 12-30-04 Captain Nunnally woke me by stepping on my left hand. I witnessed Captain Nunnally step over me and kick Aaron Pellum in his back. About 1 hour later Aaron ask[ed] me to look at his back (lower back) and I told him it was red and he should see a doctor.

---

[69]    Exhibit 6 at p. 20, attached to Plaintiff's motion for summary judgment. [104]

[70]    *See* Pellum Declaration attached as Exhibit FFF to Plaintiff's First Motion for Summary Judgment. [104]

[71]    *See* Nunnally Affidavit [134-7] at ¶¶ 12, 14.

[72]    *See* Exhibit WW to Plaintiff's Notice of Filing Exhibits. [47]

We both decided to see medical when placed in lockup and his back was still discolored and swollen[.][73]

Of course, the unjustified striking or beating of a prisoner by police or correctional officials constitutes cruel and unusual punishment which is actionable under 42 U.S.C. § 1983. *Slaken v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). A genuine issue of material fact exists as to whether Captain Nunnally kicked Plaintiff without provocation. The Court concludes that Plaintiff's injuries are not de minimis, and that genuine issues of material fact exist as to whether Captain Nunnally assaulted Plaintiff without provocation, in violation of Plaintiff's Eighth Amendment rights, and it is recommended that this issue be set for trial.

### 4. Inadequate Medical Care

In order to establish a violation of the Eighth Amendment for inadequate medical care, a plaintiff must show that the defendants were deliberately indifferent to his serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citations omitted). Deliberate indifference is a very high standard, and a showing of mere negligence will not meet it. *Grayson v. Peed*, 195 F.3d at 696 (*citing Estelle*, 429 U.S. at 105-06). The test for deliberate indifference has two parts: first, whether the deprivation of medical care was sufficiently serious (objective component) and second, whether there existed a culpable state of mind (subjective component). *See Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

---

[73]     *See* Exhibit B to Plaintiff's Motion. [29]

The type and amount of medical care an inmate receives is discretionary. *See Brown v. Thompson*, 868 F.Supp. 326 (S.D.Ga. 1994). The mere fact that a prisoner may believe he had a more serious injury or that he required better treatment does not establish a constitutional violation. *See, e.g., Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). Although the Constitution requires that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee a prisoner receive the treatment of his choice. *Jackson v. Fair*, 846 F.2d 811, 817-18 (1st Cir. 1988). It follows, then, that disagreements between an inmate and a physician over the inmate's proper medical care do not state a Section 1983 claim unless exceptional circumstances are alleged. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). Indeed, a health care provider's method of diagnosis and choice of treatment of an inmate is not subject to judicial review. *Peterson v. Davis*, 551 F.Supp. 137, 146 (D.Md. 1982), *aff'd* 729 F.2d 1453 (4th Cir. 1984). In the context of alleged indifference to serious medical needs, in order to state a Section 1983 claim, the plaintiff must allege that he suffered specific injury as a result of the specific conduct of a defendant, and show an affirmative link between the injury and that conduct. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).[74] Finally, mere negligence or malpractice does not violate the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Therefore, incorrect medical treatment, such as an incorrect diagnosis, is not actionable under 42 U.S.C. § 1983. *Miltier*, 896 F.2d at 851. In other words, negligent medical treatment, even if shown to have occurred, is not a violation of constitutionally protected rights. *Estelle*, 429 U.S. 97, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1977); *Johnson v. Quinones*, 145 F. 3d 164 (4th Cir. 1998). Importantly, too, Section 1983

---

[74] The Defendants erroneously state in their Memorandum that "His claim [for inadequate medical care] is also made without any firm basis since he is suing the very people, such as the nurses, he claims said he needed to see a doctor." [134-2] at p. 11. The Plaintiff has not sued any nurses in this action.

does not impose liability for violations of duties of care arising under state law. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 200-03, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Thus, even if the Plaintiff were able to show that the Defendants' actions somehow constituted medical negligence or medical malpractice, these are not actionable under 42 U.S.C. § 1983.

In the case *sub judice*, the Defendants include both Dr. Smith, a medical provider, and the non-medical SCDC personnel. A different standard applies to each group, as will be discussed below.

### a. Deliberate Indifference--Medical Personnel

Whether a medical provider has been deliberately indifferent to a prisoner's serious medical need is a two part inquiry. First, the plaintiff must allege a deprivation of medical care that was sufficiently serious (the objective component) and second, allege that there existed a "sufficiently culpable state of mind" by the defendant (the subjective component). *See Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The first issue (the objective element) is whether the plaintiff has pled the deprivation of a serious medical need. That element can be further broken down into two components: (1) a serious medical need and (2) mistreatment or non-treatment of that need.



There is no clear definition of what constitutes a serious medical need. However, the Eighth Amendment embraces the treatment of medical conditions which may cause future health problems. *Smith v. Preston*, 2007 WL 626191 at *3 (D.S.C. Feb. 23, 2007) (*citing Helling v. McKinney*, 509 U.S. 25, 35 (1993)). "A medical need is 'serious' if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention' or if denial of or a delay in treatment causes the inmate 'to suffer a life-long handicap or permanent loss.'" *Coppage v.*

Page 48 of 71

*Mann*, 906 F.Supp. 1025, 1037 (E.D.Va. 1995) (*quoting Monmouth Co. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). The objective element also requires the plaintiff to prove that his serious medical need was not timely or properly treated. *Smith v. Preston*, 2007 WL 626191 at *3. Although expert exploration may be required to aid the jury in determining the threshold standard of medical care, a jury may find, without further expert testimony, that certain actions fell so far below enunciated standards that they constituted gross indifference actionable under Section 1983. *Miltier v. Beorn*, 896 F.2d 848, 852 (4th Cir. 1990). Thus, summary judgment may not properly be based on an absence of a statement from an expert that the care given was grossly negligent when inferences drawn from the record could support such a finding. *Id.*

The second element (the subjective component) requires a showing that the defendant's actions were wanton. The standard for wantonness depends upon the circumstance of the case. *Smith v. Preston*, 2007 WL 626191 at *3 (*citing Wilson*, 501 U.S. at 302-03). To be deliberately indifferent, a defendant must know of and disregard an objectively serious condition, medical need, or risk of harm. *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997). Deliberate indifference may be demonstrated by either actual intent or reckless disregard. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). A defendant acts recklessly by disregarding a substantial risk of danger that is either known to him or which would be apparent to a reasonable person in his position. *See, id.* at 852-53 (deliberate indifference to cardiac condition); *Mitchell v. Aluisi*, 872 F.2d 577, 580 (4th Cir. 1989) (denial of requests for medication); *Cooper v. Dyke*, 814 F.2d 941, 945-46 (4th Cir. 1987) (obvious risk created by gunshot wound); *Sosebee v. Murphy*, 797 F.2d 179, 182-83 (4th Cir.1986) (condition escalated into obvious risk); *Loe v. Armistead*, 582 F.2d 1291, 1296 (4th Cir.1978) (delay in treating an obviously broken arm). A plaintiff must prove that the defendant was aware of facts showing a substantial risk of harm and also drew the

Page 49 of 71

inference that a substantial risk of harm existed. *See, Johnson v. Quinones*, 145 F.3d 164, 167-68 (4th Cir. 1998) (although doctors knew of symptoms, there was no evidence that doctors knew of the medical condition underlying the symptoms).

As objective evidence of the Plaintiff's continuing pain and injury stemming from Captain Nunnally's alleged assault, Plaintiff has provided the Court with the following documentation:

- SCDC Health Services Medical Summary dated December 31, 2004, stating that Officer Bellamy asked to have Plaintiff seen because he had been kicked in the back.[75]

- SCDC Health Services Medical Summary dated December 31, 2004 noting that the LPN had visualized a pink area, slightly raised, measuring about 6-10 cm by 2-3 cm. on Plaintiff's left lower back. Plaintiff reported pain and discomfort with movement, and was prescribed Ibuprofen or acetaminophen, and a muscle relaxant.[76]

- SCDC Health Services Medical Summary dated January 1, 2005 noting that "bruise is unchanged and he is stable. No sign of color change."[77]

- SCDC Health Services Medical Summary dated January 2, 2005 noting that "color of bruise has changed. It is black and blue at this time, with yellowing throughout the area of previous bruise. . . . Inmate contends that the area is still uncomfortable and continues the ordered medications for comfort."[78]



- A Request to Staff Member (Medical Doctor) dated January 3, 2005, stating he was kicked in his back. "I have a black, blue, yellow & green bruise on my lower left back. It

---

[75]    Exhibit 6 at p. 3, attached to Plaintiff's motion for summary judgment. [104]

[76]    Exhibit 6 at p. 2, attached to Plaintiff's motion for summary judgment. [104]

[77]    Exhibit 6 at p. 2, attached to Plaintiff's motion for summary judgment. [104]

[78]    Exhibit 6 at p. 3, attached to Plaintiff's motion for summary judgment. [104]

is so painful I can't stand up straight and I can't sit for any substantial time.  . . . It hurts when I urinate & I've seen blood in my urine. . . . I was given Parafon or Teva it says & it helped but I'm out.  Please see me."[79]

- A Request to Staff Member (Dr. Cusack (psychiatrist) dated January 3, 2005, stating:

  > I was assaulted by an officer and I need to see you please.  I am having problems eating & sleeping. I'm feeling like I can't concentrate and I'm having trouble sleeping.  I'm feeling depressed and fearful that I may be attacked by these officers again.  Please see me as soon as possible please.  Thank you.

Plaintiff was informed that he was scheduled to be seen on January 10, 2005.[80]

- SCDC Health Services Medical Summary dated January 4, 2005; Plaintiff reports he was still having " a lot of pain.  It hurts for me to stand up straight.  . . . I'm also starting to see a red tinge to my urine and it burns when I urinate.  . . .  I can't sit for long periods."  Ibuprofen and Chlorzoxazone[81] were prescribed.[82]

- A Request to Staff Member (Dr. Smith) dated January 5, 2005, stating he was severely kicked in his back by Captain Nunnally on December 30, 2004.  "I have blood in my urine.  I am in a great deal of pain in my back left leg & testic[le]s.  Please see me soon.  The pain is unbearable."[83]



- A statement dated January 6, 2005, wherein Plaintiff's cell-mate, Brian Evans, saw Plaintiff's back and described the lower left side as "blue/purple/yellowish, approx 4

---

[79]     Exhibit O to Plaintiff's Motion. [29]

[80]     Exhibit GG to Plaintiff's Motion.  [29]

[81]     Chlorzoxazone is used to relieve pain and stiffness caused by muscle strains and sprains. It is used in combination with physical therapy, analgesics (such as aspirin or acetaminophen), and rest.
         *See* http://www.nlm.nih.gov/medlineplus.druginfo/medmaster/a682577.html, accessed on November 5, 2007.

[82]     Exhibit 6 at p. 3, attached to Plaintiff's motion for summary judgment.  [104]

[83]     *See* Exhibit N to Plaintiff's Motion.  [29]

inches long."[84]  Evans recalled: "I personally heard Nurse Terry in Jan. 2005 that a urine

test he was aware of for Aaron Pellum tested positive for blood and that he may need

outside medical care."[85]

- Investigator Antley's written "Report of Interview," dated January 6, 2005, stated that

   Investigator Antley visualized "an approximately six (6) inch rectangular shaped bruise

   on Pellum's lower left back near his kidney. . . . No photos were taken of the bruise."[86]

- A Request to Staff Member (addressed to Nurse Allen or Dr. Smith) which stated:

   > I have a big black & blue bruise over my left kidney.  Blood is in my urine.  I'm in so much
   > pain.  My back is in knots.  I can't stand up straight it hurts so bad & I can't sit down for
   > long.  My left leg wants to pull up when I stand.  Please see me soon.  Please I'm in bad
   > pain.  Thank you.[87]

   According to the notation on the Request to Staff Member, Plaintiff was scheduled to see

   the doctor on January 11, 2005.[88]

- A copy of an Inmate Grievance Form complaining that Plaintiff has not seen a doctor as

   of January 10, 2005 and asking to see a doctor.  Plaintiff states Captain Nunnally severely

   kicked him in his back and he is urinating blood and can't stand or sit, and must be

   helped off the floor by his room-mate, Brian Evans.  He has a shooting sharp pain down

   his left leg.[89]

---

[84]     See Exhibit C to Plaintiff's Motion [29] (sworn statement by Brian Evans).

[85]     See Exhibit WW to Plaintiff's Notice of Filing Exhibits.  [47]

[86]     This Report is attached to Plaintiff's Response [116] filed with the court.

[87]     See Exhibit UUU, attached to Plaintiff's First motion for summary judgment.  [104]

[88]     Id.

[89]     See Exhibit D to Plaintiff's Motion.  [29]

- SCDC Health Services Medical Summary dated January 11, 2005 noting that Plaintiff complained of redness in his urine. Plaintiff was noted to have "large 10x6 cm area of echymosis near iliac crest posteriorly."[90]

- SCDC Health Services Medical Summary dated January 12, 2005 indicating that Plaintiff gave a urine sample for urinalysis.[91] According to Plaintiff, Dr. Smith saw him on January 12, 2005. (Compl. at p. 15). Plaintiff states that Dr. Smith told him he could have possible damage to his sciatic nerve. (Id.). The urine test detected blood in his urine. (Id.).

- An affidavit executed by Plaintiff on January 13, 2005 stating that he has blood in his urine and sharp pains in his back and down his left leg. Plaintiff cannot stand up straight and when he does, it hurts. Plaintiff has been sleeping on a mattress on the floor. A Nurse has seen him about three times at his cell door and looked at his back and saw that the bruise was big, and purple, green and yellow.[92]

- A sworn statement from Plaintiff's mother, Karen Manigault, a Registered Nurse, who visited Plaintiff at Lieber in January 2005:

  I could see a bruise on Plaintiff's left vertebral back. The bruise was yellowish/greenish toward the outside of the area with some darker purplish/red in the middle. The area appeared to be healing. . . . [Plaintiff] complained of severe pain and blood in his urine. Pain and blood in his urine could have indicated a serious internal injury that was not properly investigated. He should have seen a nurse and/or a Doctor within 24 hours to investigate the need for further treatment by an Urologist. Within 24 hours of the injury, pain medication was indicated for [Plaintiff's] complaints of pain.[93]

---

[90] Exhibit 6 at p. 5, attached to Plaintiff's motion for summary judgment. [104]

[91] Exhibit 6 at p. 5, attached to Plaintiff's motion for summary judgment. [104]

[92] See Exhibit FF to Plaintiff's Motion. [29]

[93] See Exhibit X X, attached to Plaintiff's [47]. Plaintiff has filed with the Court a copy of his mother's State Board of Nursing license in support of his mother's sworn statement. Id.

• A copy of a Request to Staff Member (Dr. Smith) dated January 15, 2005 which states:

> I saw you briefly on 1-11-05. You ordered me muscle relaxers & I've not gotten them yet. I am in severe pain. The injury to my back & leg make it impossible to stand up straight or even sit down. Please get my medication to me fast. The blood in my urine has been bad today. Are you going to see me about the nerve damage you said I may have.[94]

An LPN replied on January 17, 2005: "Meds will be here tomorrow."[95]

• A copy of a Request to Staff Member (Dr. Smith) dated January 16, 2005 which states:

> I saw you about five days ago and I've still not received any medication for my painful back, leg & testicle. . . . It's been 17 days now since the assault & still no medicine. I am experiencing numbness on the left side of my body particularly my left leg. Please see me as soon as you can. I am in serious pain & am worried about this numbness. What's wrong with me?[96]

The response to this was "Noted". It was signed: "MD". [97]

• A copy of a Request to Staff Member (Ms. McCants-Max Social Worker) dated January 23, 2005:

> This is my second request to you in the last 10 days. I guess you didn't get the first one. I am really having bad problems with my eating and I always stay in the bed. I sleep and lay there and lay there. I lay there and think about that Captain that assaulted me. He just looked like he would kill me if he could. I need to see Dr. Cusack please.

Ms. McCants responded: "I/M Pellum. Dr. Cusack will be away from the institution until March 2005. Dr. Cobb will be filling in for him."[98]

• A copy of a Request to Staff Member (Dr. Smith) dated January 30, 2005, stating:

> The meds I got from you finally come about a week ago they do no good to relieve the pain I have. Please see me again. You do not know how much pain I am in. I still even see blood in my urine a month later. Something is bad wrong please see me. I have still

---

[94]     See Exhibit PP to Plaintiff's Rebuttal. [45]

[95]     See Exhibit PP to Plaintiff's Rebuttal. [45]

[96]     See Exhibit QQ to Plaintiff's Rebuttal. [45]

[97]     See Exhibit QQ to Plaintiff's Rebuttal. [45]

[98]     See Exhibit HH to Plaintiff's Motion. [29]

> not he[a]rd from you on my leg that you said could have s[c]iatic nerve damage. Thank you.[99]

- SCDC Health Services Medical Summary dated January 31, 2005 noting that Plaintiff states: "I'm still having back pain. At night it starts to tighten upon me and it is hard for me to move." Upon assessment, "significant decrease in bruising from prior assessment. Inmate still guarding same."[100]

- SCDC Health Services Medical Summary dated January 31, 2005 stating: "Urinalysis shows hematuria–Inmate was kicked in back some weeks ago. Will follow with serial UA and refer to urology if it does not clear spontaneously. Please obtain weekly UA." (Signed) Walter Smith, Physician I.[101]

- An undated letter from Plaintiff to Ms. McCants, the Max social worker, stating in part:

  > I am having problems eating & sleeping. I am having flashbacks of being assaulted by Captain Nunnally. I think of it all the time I feel so scared that I will be killed by his officers for telling on him. . . . [102]

- SCDC Health Services Medical Summary dated February 1, 2005 indicating Plaintiff's urine tested positive for blood, and a weekly urine screen was ordered.[103]

- SCDC Health Services Medical Summary dated February 2, 2005 indicating Plaintiff was "seen for persistent back pain and hematuria after being kicked in the left flank/back area about 1 month ago. Gross hematuria resolved, microscopic hematuria persists."[104]



---

[99]    *See* Exhibit AAA, attached to Plaintiff's [47].    Plaintiff states this Request was never answered. *Id.*

[100]    *See* Exhibit 6 at p. 6, attached to Plaintiff's motion for summary judgment. [104]

[101]    *See* Exhibit 6 at p. 5, attached to Plaintiff's motion for summary judgment. [104]

[102]    *See* Exhibit TT to Plaintiff's Rebuttal. [45]

[103]    *See* Exhibit 6 at p. 6, attached to Plaintiff's motion for summary judgment. [104]

[104]    *See* Exhibit 6 at p. 7, attached to Plaintiff's motion for summary judgment. [104]

- SCDC Health Services Medical Summary dated February 2, 2005 indicating Plaintiff was seen by Mental Health Clinic on February 1, 2005 and stated his fear that officers would assault him on the yard.[105]

- SCDC Health Services Medical Summary dated February 2, 2005 indicating Plaintiff's UA dipstick test was negative for blood.[106]

- A copy of SCDC's Medical Clearance for Transfer dated February 14, 2005, indicating Plaintiff was currently on Ibuprofen 800 mg. and Chlorzoxazone 500 mg.[107]

- SCDC Health Services Medical Summary dated February 14, 2005 indicating Plaintiff was received from Lieber; current meds include Ibuprofen 800 mg. and Chlorzoxazone 500 mg. Plaintiff asked to see MD about his back. As Plaintiff's medications had not been transferred with him, his Ibuprofen 800 mg. and Chlorzoxazone 500 mg. were refilled for two weeks.[108]

- A copy of a Request to Staff Member (Medical Sick Call) at McCormick CI dated February 17, 2005 stating:

  > I was assaulted in Dec. 04 by a Capt[ai]n & I spent a total of 7 days & nights in a holding cell. I am in severe pain in my leg, back & testic[le]. I have been urinating blood. I have headache not stop [sic]. Please see me A.S.A.P.[109]



---

[105]    *See* Exhibit 6 at p. 7, attached to Plaintiff's motion for summary judgment. [104]

[106]    *See* Exhibit 6 at p. 8, attached to Plaintiff's motion for summary judgment. [104]

[107]    *See* Exhibit 5 at p. 4, attached to Plaintiff's motion for summary judgment. [104]

[108]    *See* Exhibit 6 at p. 8, attached to Plaintiff's motion for summary judgment. [104]

[109]    *See* Exhibit BBB, attached to Plaintiff's [47].   Plaintiff states this Request was never answered. *Id.*

- SCDC Health Services Medical Summary dated April 25, 2005 indicating Plaintiff had slight spasms in his back and had difficulty doing waist bends or a tiptoe walk. He was prescribed Chlorzoxazone and Motrin.[110]

- SCDC Medical Screen dated April 27, 2005, stating he was on 800 mg. Ibuprofen.[111]

- A Request to Staff Member (BRCI) dated May 5, 2005 which requested to be seen by medical due to pain in his lower left back and left leg, and because he was seeing blood in his urine from time to time.[112]

- A sworn declaration by inmate Donique Capers (#250644) stating that when he first saw Plaintiff on July 2, 2005, Plaintiff had a "bad limp in his left leg & also a hunch in his back."[113]

- A copy of a Request to Staff Member (Medical Sick Call) at BRCI dated August 15, 2005 stating:

  I wrote more than one request about my back, leg & testic[le]s. The pain is none stop tylenol wont even toch the pain. [Sic] I was assaulted by a Capt[ai]n at Lieber CI in December 2004 I am suppose[d] to have follow [up] care. I fear I have siatic [sic] nerve damage to my left leg as Dr. Smith at Lieber CI told me I may have[.] My leg wants to pull up when I stand up & it is numb. Please see me please.[114]



---

[110]    *See* Exhibit 6 at pp. 11-12, attached to Plaintiff's motion for summary judgment. [104]

[111]    *See* Exhibit 5 at p. 5, attached to Plaintiff's motion for summary judgment. [104]

[112]    *See* Plaintiff's Request to Staff Member, attached as Exhibit JJJ to Plaintiff's motion for summary judgment. [104]

[113]    *See* Exhibit V V, attached to Plaintiff's [47]. Capers is listed in the Inmate Directory of the SCDC website as "Dominique Capers."

[114]    *See* Exhibit CCC, attached to Plaintiff's [47]. An LPN replied on August 25, 2005: "I see no documentation." *Id.*

- An Inmate Grievance Form (Step 1) dated August 19, 2005 which briefly describes Captain Nunnally's alleged assault and asks to see a doctor: "My leg wants to pull up when I stand up straight."[115]

- A Sick Call Request dated October 2, 2005, complaining that he has blood in his urine and his lower back and left leg continue to hurt as a result of the assault in December 2004.[116]

- SCDC Health Services Medical Summary dated October 4, 2005 indicating Plaintiff was seen in Sick Call for continuing problems with his back and lower left leg. Plaintiff continued to have pain and blood in his urine. Again, analgesics and Chlorzoxazone were prescribed.[117]

- A Sick Call and Dental Request dated October 5, 2005 which states:

    I have been complaining since I've been here about the pain in my left leg, back & testicle also the numbness on my left side especially my leg and when it is numb it feels sharp prickels and my penis and testicals go numb. [Sic][118]

- SCDC Health Services Medical Summary (Doctor's Clinic) dated October 19, 2005 noting Plaintiff's urinalysis was positive for blood; a notation was made to rule out kidney trauma.[119]

---

[115]    *See* Exhibit E to Plaintiff's Motion [29].

[116]    *See* Plaintiff's Request to Staff Member, attached as Exhibit KKK to Plaintiff's first Motion for Summary Judgment. [104]

[117]    *See* Exhibit 6 at p. 13, attached to Plaintiff's motion for summary judgment. [104]

[118]    *See* Exhibit DDD, attached to Plaintiff's [47]. On October 11, 2005, an LPN replied in response: "This is inopropiate[.]" [Sic] *Id.*

[119]    *See* Exhibit 6 at p. 14, attached to Plaintiff's motion for summary judgment. [104]

- A sworn declaration from Brian Evans[120] stating that between September 15, 2005 and October 20, 2005, he personally heard Plaintiff complain to BRCI nursing staff that he has been in constant pain since being assaulted by Captain Nunnally on December 30, 2004, and had personally heard BRCI nursing staff inform Plaintiff that he still has blood in his urine.[121]

- A Sick Call Request dated October 23, 2005, asking to see a doctor because of the pain in his lower back and left leg.[122]

- SCDC Health Services Medical Summary dated October 26, 2005 noting Plaintiff was seen in the Doctor's Clinic at BRCI. Given Plaintiff's "history of persistent flank pain and gross hematuria", a urology consult would be requested.[123]

- SCDC Health Services Medical Summary dated November 11, 2005, noting that Plaintiff had undergone a urology test on November 10, 2005 which indicated Plaintiff had hematuria. A CT of the abdomen and pelvis with and without contrast was recommended. Plaintiff did not want to schedule a cysto at that time.[124]

- Plaintiff's Lumbar spine (AP and LAT) views showed no radiographic abnormalities, The tenth, eleventh and twelfth ribs showed no fractures.[125]



- A Sick Call and Dental Request dated November 25, 2005, stating:

---

120  As mentioned *supra*, Evans had been in the holding cell at Lieber and then placed in the same Max cell at Lieber. Later, Evans was transferred to BRCI, and Evans and Plaintiff were placed in adjacent cells. *See* Exhibit W W to Plaintiff's Notice of Filing Exhibits. [47]

121  *See* Exhibit WW, attached to Plaintiff's [47].

122  *See* Plaintiff's Request to Staff Member, attached as Exhibit LLL to Plaintiff's motion for summary judgment. [104]

123  *See* Exhibit 6 at p. 14, attached to Plaintiff's motion for summary judgment. [104]

124  *See* Exhibit 6 at p. 15, attached to Plaintiff's motion for summary judgment. [104]

125  *See* Exhibit 6 at p. 27, attached to Plaintiff's motion for summary judgment. [104]

I was kicked in my back last December 2004. I was seen by Dr. Smith one time at Lieber Cl. He then told me I may have damage to my siatic nerve but I've had no follow up. I've had numbness to my left leg back and arm & severe pain I need to see a nurse and a doctor please. [Sic][126]

- SCDC Physician's Transfer Note dated November 30, 2005, requesting CT of abdomen and pelvis due to Plaintiff's persistent hematuria, which has been present since when he claims he was kicked in the kidneys. "Blood in urine has never resolved."[127]

- A Sick Call Request dated December 12, 2005, stating that he had been trying to see a doctor for the previous two months because he has severe pain in his back, leg, and testicles due to an assault in December 2004, and requesting pain medication.[128]

- A Sick Call Request dated December 28, 2005, stating he had seen a nurse approximately two weeks earlier, who told him he would be able to see a doctor, but he had not seen one; Plaintiff had requested a refill of his Ibuprofen for pain but had not received a refill.[129]

- A Sick Call Request dated January 11, 2006, complaining that he has been told he would see a doctor soon, but had not, and he was seeing blood in his urine and his stool and again asked to see a doctor.[130]

---

[126]    See Exhibit E E E, attached to Plaintiff's [47]. There is no staff signature on this copy to indicate that this Request was received by BRCI staff. Id.

[127]    See Exhibit 6 at p. 28, attached to Plaintiff's motion for summary judgment. [104]

[128]    See Plaintiff's Request to Staff Member, attached as Exhibit MMM to Plaintiff's first motion for summary judgment. [104]

[129]    See Plaintiff's Request to Staff Member, attached as Exhibit NNN to Plaintiff's motion for summary judgment. [104]

[130]    See Plaintiff's Request to Staff Member, attached as Exhibit OOO to Plaintiff's motion for summary judgment. [104]

- A Request to Staff member (sick call) dated February 23, 2006, stating "I am in severe pain in my back and left leg. My testic[le] hurt[s] and blood is in my urin[e] sometimes from an assault by an officer at Lieber CI. Please see me as soon as possible."[131]

- A Request to Staff member (medical sick call) dated March 2, 2006, stating "I have severe back pain, so much it doubles me over. My left leg goes numb from nerve damage and my testicles hurt all the time. . . . Please see me soon."[132]

- A SCDC Health Services Medical Summary indicating that Plaintiff was scheduled for a flex cysto with Dr. Pinto at Westmark Surgery Center in Sumter on March 20, 2006.[133]

- A Request to Staff member (medical sick call) dated March 18, 2006, stating "I have lost partial use of my left leg due to nerve damage from an assault by a captain at Lieber CI. Also my back and leg spasm and hurt all the time. . . . I need to see a neurologist. The pain is severe."[134]

- A SCDC Health Services Medical Summary notation indicating that Plaintiff was taken to his appointment with Dr. Pinto at Westmark Surgery Center on March 20, 2006.[135]

- A SCDC Health Services Medical Summary Sick Call dated March 23, 2006, indicating that Plaintiff complained of "numbness in the back of [his] left leg[.]"[136]

---

[131] See Plaintiff's Request to Staff Member, attached as Exhibit PPP to Plaintiff's motion for summary judgment. [104]

[132] See Plaintiff's Request to Staff Member, attached as Exhibit QQQ to Plaintiff's motion for summary judgment. [104]

[133] See Exhibit 6 at p. 20, attached to Plaintiff's motion for summary judgment. [104]

[134] See Plaintiff's Request to Staff Member, attached as Exhibit RRR to Plaintiff's motion for summary judgment. [104]

[135] See Exhibit 6 at p. 20, attached to Plaintiff's motion for summary judgment. [104]

[136] See Exhibit 6 at p. 21, attached to Plaintiff's motion for summary judgment. [104]

- A SCDC Health Services Medical Summary Doctor's Clinic note dated March 29, 2006 indicating that Plaintiff had pain and numbness from left lower back radiating to groin area as a result of an altercation with officers at Lieber. Motrin 800 mg was prescribed.[137]

- A SCDC Health Services Medical Summary Lab Clinic note dated April 27, 2006 indicating that Plaintiff is being followed by urology for hematuria and has a follow-up urology appointment next week.[138]

- SCDC Physician's Transfer Note dated May 4, 2006, indicating that Plaintiff had a follow up at the urology clinic that day.[139]

On December 31, 2004, Plaintiff gave the morning nurse a request for medical attention, and was told he would be put down to see Dr. Smith. (Compl. at 14). Later, Plaintiff was told he would see Dr. Smith on January 5, 2005. (Compl. at 15). A few days later, Plaintiff was told he would be seen by Dr. Smith on January 10, 2005. (Compl. at 15). Plaintiff did not see Dr. Smith until January 12, 2005. (Compl. at 15). Plaintiff alleges that after the assault by Captain Nunnally, he was in constant, severe pain, and that Dr. Smith denied him medical care until January 12, 2005. (Compl. at 15). Thirteen (13) days after the alleged assault, on January 12, Plaintiff was seen by Dr. Smith, who ordered a urine test and prescribed pain medicine for Plaintiff. (*Id.*). Dr. Smith told Plaintiff he could have possible damage to his sciatic nerve. *Id.* The urine test detected blood in his urine. *Id.* Plaintiff did not receive his prescribed pain medicine until January 22, 2005, which was twenty-three (23) days after the alleged assault. *Id.* Plaintiff contends that Dr. Smith did not perform a follow-up examination, despite the blood in Plaintiff's urine, and even though Dr. Smith told Plaintiff he could have possible damage to his

---

[137]    *See* Exhibit 6 at p. 22, attached to Plaintiff's motion for summary judgment. [104]

[138]    *See* Exhibit 6 at p. 23, attached to Plaintiff's motion for summary judgment. [104]

[139]    *See* Exhibit 6 at p. 24, attached to Plaintiff's motion for summary judgment. [104]

sciatic nerve. Plaintiff continues to experience "debilitating" pain in his left leg. (Compl. at 15-16). Plaintiff contends that Dr. Smith was deliberately indifferent to his serious medical needs. (Compl. 16).

Plaintiff has provided evidence that Dr. Smith saw Plaintiff one time. Arguably, Plaintiff also has provided evidence that Plaintiff's injury was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention" as is evidenced by the sworn statement of Brian Evans, the statement of Investigator Antley, and Plaintiff's mother, and Nurse Terry, and others, as set forth above, concerning the size and color of the bruise. *See Coppage v. Mann*, 906 F.Supp. at 1037 (*quotation omitted*). The record before the Court does not contain an affidavit of Dr. Smith and thus the Court does not know whether his treatment of Plaintiff was appropriate and pursuant to acceptable medical practices, or whether Dr. Smith was deliberately indifferent to Plaintiff's needs, as Plaintiff alleges. Finally, the Defendants have not provided the court with any medical records which indicate that Dr. Smith treated the Plaintiff more than one time.

As mentioned above, a serious medical need is one which may cause future health problems. *See Smith v. Preston*, 2007 WL 626191 at *3 (*citation omitted*). As is apparent from the Court's summary of Plaintiff's medical records, Plaintiff has had numerous problems with his back and kidney since the date of the alleged assault. Thus, Plaintiff has demonstrated that he had a serious medical need. Furthermore, Plaintiff has raised a genuine issue of material fact as to whether Dr. Smith was deliberately indifferent to Plaintiff's serious medical needs.



The Defendants have argued in general terms that Plaintiff's claims of inadequate medical care are legally insufficient.[140] The Court disagrees. As a genuine issue of material fact exists with respect to this claim, it is recommended that this issue be set for trial.

---

[140]    *See* Defendants' Second memorandum in support of motion for summary judgment [134-2] at pp. 11-13.

## b. Deliberate Indifference– Non-Medical Personnel

The Fourth Circuit has held that to bring a medical treatment claim against non-medical prison personnel, an inmate must show that such officials were personally involved with a denial of treatment, deliberately interfered with prison doctors' treatment, or tacitly authorized or were indifferent to the prison doctors' misconduct. *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990). An inmate or detainee who alleges deliberate indifference must meet "a very high standard-a showing of mere negligence will not meet it." *Id. (citing Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999)). To be held liable for such allegations, an officer "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* This standard necessitates "a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." *Id.* Whether a prison official had the requisite knowledge is a question of fact subject to demonstration by inference from circumstantial evidence, and a fact finder may conclude that prison official knew of substantial risk from the very fact that a risk was obvious. *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995).



According to Plaintiff's Complaint, on December 30, Plaintiff told Major Nettles that Captain Nunnally had assaulted him, and asked Major Nettles to take him to medical, or contact medical, because he was in extreme pain and felt like something was broken. (Compl. at 13). Plaintiff contends that Major Nettles refused to summon medical attention for Plaintiff and was deliberately indifferent to his serious medical needs. (Compl. at 13; 21). Major Nettles does not respond to Plaintiff's allegations; neither of the affidavits filed by him [134-5; 134-6] confirms or denies that on December 30, 2004, Plaintiff asked Major Nettles to obtain medical attention for him, and that Major Nettles refused. Accordingly, the Court finds that Major Nettles has

conceded these issues, and it is recommended that Plaintiff be granted summary judgment against
Major Nettles on the claim asserting a denial of medical care in violation of the Eighth
Amendment.

Plaintiff further alleges that after Captain Nunnally kicked him, Plaintiff asked Captain
Nunnally to get a nurse because he felt like something was "broken" where he had been kicked.
(Compl. at 13). According to Plaintiff, "He ignored me and walked away." Plaintiff contends
that Captain Nunnally denied him medical attention, and was deliberately indifferent to his safety
and well-being. (Compl. at 13; 20). Captain Nunnally does not respond to Plaintiff's allegations
as to Plaintiff's request for medical care, although he does state that he "never had a physical
confrontation" with Plaintiff and "never assaulted or battered" Plaintiff. [134-7; 134-8] Captain
Nunnally's Affidavits do not address the allegation that he failed to obtain medical attention for
Plaintiff after Plaintiff requested it. The Court finds that Captain Nunnally has conceded these
issues, and it is recommended that Plaintiff be granted summary judgment against Captain
Nunnally on the claim asserting a denial of medical care in violation of the Eighth Amendment.

In addition, Plaintiff has alleged that Warden Burtt and AW Thompson knew of
Plaintiff's need for medical care, were personally involved in denying the Plaintiff medical
treatment and were deliberately indifferent to Plaintiff's serious medical needs. (Compl. at 14;
22). These Defendants have not submitted affidavits to contradict Plaintiff's specific allegations.
Instead, the Defendants submit a general argument denying the Plaintiff's claims by stating:
"Here, Plaintiff's claims must fail as he has not pled nor can he demonstrate any significant
failure or omission to provide medical care by any of these Defendants."[141] Because Warden
Burtt and AW Thompson have not specifically responded to Plaintiff's claims, it appears that
they have conceded such claims, and therefore it is recommended that summary judgment be

---

[141]     Defendants' second memorandum in support of summary judgment [134-2] at p. 12.

granted to Plaintiff as to Warden Burtt and AW Thompson on the claim that those Defendants denied him adequate medical care in violation of the Eighth Amendment.

### E.  Liability of Warden Burtt, AW Thompson, AW Bodison, Major Nettles, and Lt. Elka

A warden or prison official may be liable for his subordinates' constitutional violations if the official "tacitly authorized" or was "indifferent to the . . . constitutional violations." *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (*citing Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  As noted above, in order to maintain a claim under Section 1983, a plaintiff must show, in part, that a named Defendant deprived him or her of a federal right.  *See Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *see also Harris v. City of Va. Beach*, 11 Fed. App'x 212, 215 (4th Cir. 2001) (affirming the district court's dismissal of the plaintiff's claim against five defendants when the plaintiff did not allege any of these defendants were personally involved in the alleged deprivation of his civil rights); *Freeman v. S.C. Dep't of Corr.*, No. 0:06-1171-DCN-BM, 2007 WL 1239504, *7 (D.S.C. Mar.30, 2007); *McGhee v. Moyer*, 60 F.R.D. 578, 586 (W.D.Va. 1973) ("Otherwise stated, the doctrine of respond[ea]t superior has no application in a § 1983 action insofar as liability is concerned.").

In the present case, Plaintiff set forth numerous specific allegations against Warden Burtt. AW Bodison, AW Thompson, Major Nettles, and Lt. Elka, separately, or together, in his "Statement of Claim" section of his verified Complaint (Compl. at 4; 5; 6; 7; 8; 9; 10; 11; 12; 13; 14; 18; 21; 22; 24).  Plaintiff specifically alleges that these Defendants were personally involved in the various alleged deprivations of his civil rights.  None of the Defendants, with the exception of Major Nettles, provided affidavits to the court in response to any of Plaintiff's allegations. Major Nettles' Affidavit responds to only a few of the Plaintiff's claims.  The Defendants' brief sets forth general denials and does not attempt to address with any specificity or attention to detail the facts set forth in Plaintiff's verified Complaint.



Page 66 of  71

In *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984), an inmate brought suit against several prison guards and three high ranking prison supervisory officials: the warden, the director of prisons, and the secretary of corrections. *Slakan*, 737 F.2d at 370. The plaintiff alleged the guards used excessive force in violation of the Eighth Amendment for using high-pressure water hoses, tear gas, and billy clubs to subdue him when he was confined to a one-man cell. *Id.* The plaintiff alleged the supervisory officials "were deliberately indifferent to a known risk of harm, as evidenced by their failure to provide prison guards with adequate training and guidance." *Id.* He claimed these officials "had been deliberately indifferent to the use of excessive force by guards or had tacitly authorized such practices through their regulations and policies." *Id.* at 371. At trial, the jury found in favor of one of the prison guards but found in plaintiff's favor with respect to the remaining defendants. *Id.* at 370.

On appeal, the Fourth Circuit stated, "The unjustified striking or beating of a prisoner by police or correctional officials constitutes cruel and unusual punishment which is actionable under 42 U.S.C. § 1983." *Id.* at 372. The court noted that "[t]he guards' conduct indisputably deprived Slakan of a right secured by the Constitution and the laws of the United States." *Id.* The court then examined "whether the responsibility for that deprivation can be traced to the actions of the guards' supervisors." *Id.* The Fourth Circuit stated,



> [Supervisory l]iability ... is not premised on respondeat superior, but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.
>
> The plaintiff, of course, assumes a heavy burden in supervisory liability cases. He not only must demonstrate that the prisoners face a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practices. Ordinarily, he cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities. Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct. A supervisor's continued inaction in the face of documented widespread abuses,

> however, provides an independent basis for finding he either was deliberately indifferent or
> acquiesced in the constitutionally offensive conduct of his subordinates.
> *Id.* at 373 (citations omitted).

Using those standards, the Fourth Circuit upheld the jury verdict on the basis of supervisory

liability. With respect to the warden, the court noted he admitted at trial that he "knew of and

condoned the use of high-pressure water hoses against inmates housed in one-man cells on at

least seven occasions in the twelve months preceding the attack upon Slakan." *Id.* The court

found him liable because "the prevalence of the hosing practice was well-known" to the warden,

"yet he failed to offer adequate guidance to his subordinates concerning the appropriate uses of

such techniques when dealing with inmates securely confined." *Id.* at 374.

In the present case, it appears to the Court that the Defendants Warden Burtt, AW

Bodison, AW Thompson, and Lt. Elka have conceded any claims of supervisory liability alleged

against them by the Plaintiff, and therefore it is recommended that the Plaintiff be granted

summary judgment on the claims of supervisory liability as to those named Defendants. As

Major Nettles, through his Affidavit [134-6], has challenged some of the facts as alleged by

Plaintiff, it is recommended that this matter be set for trial with respect to that Defendant.

### F. Conspiracy



To establish a civil conspiracy under § 1983, the plaintiff must present evidence that the

defendants acted jointly in concert and that some overt act was done in furtherance of the

conspiracy, which resulted in deprivation of a constitutional right. *Hinkle v. City of Clarksburg*,

81 F.3d 416, 421 (4th Cir. 1996). The plaintiff must come forward with specific evidence that

each member of the alleged conspiracy shared the same conspiratorial objective. *Id.* To survive

a summary judgment motion, the plaintiff's evidence must reasonably lead to the inference that

the defendants came to a mutual understanding to try to "accomplish a common and unlawful

plan." *Id.* The plaintiff's allegation must amount to more than "rank speculation and conjecture"

Page 68 of 71

and the plaintiff must show that the defendants possessed an intent to commit an unlawful objective. *Id.*

In the present case, the Plaintiff has set forth adequate evidence to survive the Defendants' motion for summary judgment on this claim. The Defendants argue in their responsive memorandum that "Plaintiff has [] failed to specify which of the nine (9) Defendants allegedly had a role in the conspiracy."[142] The Court disagrees. A review of the Plaintiff's Complaint indicates that the Plaintiff plainly states that the Defendants Burtt, Bodison, Thompson, Nettles and Elka conspired to deprive him of basic human needs and failed to protect him from other inmates.[143] Plaintiff also alleges that Carrington, Antley, and/or Burtt conspired to "hold" his grievances inside LCI so he would not be able to obtain outside review.[144] At this juncture, the Court finds that Plaintiff has forecast sufficient evidence to survive Defendants' motion for summary judgment on this claim.

### G. Plaintiff's State Law Claims

Plaintiff claims in his motion that Defendants violated S.C. Code § 16-3-620, which prohibits assault and battery with the intent to kill.[145] This section has no bearing on the events complained of, and it is recommended that any claim based upon this statute should be denied and dismissed.



Plaintiff also alleges the Defendants violated S.C. Code § 16-25-10.[146] That statute likewise is inapplicable to the facts of this case, and it is recommended that Plaintiff's claim

---

[142]    Defendants' Response [137] at p. 2.

[143]    *See* Complaint [1] at p. 10.

[144]    *See* Complaint [1] at pp. 18-19.

[145]    *See* Plaintiff's motion for summary judgment [133] at p. 1.

[146]    *See* Plaintiff's motion for summary judgment [133] at p. 1.

should be denied and dismissed. Next, Plaintiff asserts a cause of action pursuant to S.C. Code. § 16-25-65. This section applies to criminal domestic violence of a high and aggravated nature, and does not apply to inmates and correctional officers. Therefore, it is recommended that the Plaintiff's claim pursuant to this Code Section be denied and dismissed. Finally, Plaintiff sets forth a cause of action under S..C. Code § 16-3-60. This statute refers to involuntary manslaughter and "criminal negligence" and is not applicable to the present case, and it is recommended that Plaintiff's claim pursuant to Section 16-3-60 should be denied and dismissed. In conclusion, all of Plaintiff's causes of action based upon state law should be denied and dismissed.

## RECOMMENDATION

As set forth in detail above, it is recommended that the Defendants' Motion for Summary Judgment [134] should be granted in part and denied in part, and Plaintiff's Motion for Summary Judgment [133] should be granted in part and denied in part.

George C. Kosko
United States Magistrate Judge

November 6, 2007
Charleston, South Carolina

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
P.O. Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).